| |
|:---:|
| **Snyder v Goldstein** |
| 2024 NY Slip Op 31522(U) |
| April 29, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 805046/2022 |
| Judge: John J. Kelley |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

| | |
|---|---|
| **PRESENT:** **HON. JOHN J. KELLEY** | **PART** **56M** |
| *Justice* | |

--------------------------------------------------------------------------------X

NOAH SNYDER and ANITA SNYDER

               Plaintiffs,

           - v -

RICHARD GOLDSTEIN, DPM,

              Defendant.

--------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 805046/2022 |
| **MOTION DATE** | 04/01/2024 |
| **MOTION SEQ. NO.** | 002 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47

were read on this motion to/for               JUDGMENT - SUMMARY       .

## I.    INTRODUCTION

In this action to recover damages for podiatric malpractice based on allegations of departures from good and accepted podiatric care and lack of informed consent, the defendant, Richard Goldstein, DPM, moves pursuant to CPLR 3212 for summary judgment dismissing the complaint or, in the alternative, for summary judgment on the issue of whether the plaintiff Noah Snyder (the patient) was comparatively at fault for failing to comply with instructions for follow-up care. The plaintiffs oppose the motion. The motion is granted only to the extent that Goldstein is awarded summary judgment dismissing so much of the medical malpractice cause of action as was premised on the claim that plantar condylectomy surgery was not an indicated treatment for the patient's condition. The motion is otherwise denied.

## II.    FACTUAL BACKGROUND

The crux of the plaintiffs' claim is that, in the course of performing plantar condylectomy surgery on the patient's left foot on November 27, 2020, Goldstein severed the patient's flexor tendon, causing or contributing to a fracture of the metatarsophalangeal (MTP) joint, and

805046/2022  SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD           Page 1 of 27
Motion No.  002

1 of 27

necessitating corrective surgery. Specifically, the plaintiffs alleged that the surgery was not indicated in the first instance, and that it was improperly performed in any event.

The plaintiff first presented to Goldstein on April 11, 2017, complaining of bilateral calluses. Goldstein noted multiple cracks and fissures bilaterally, which he thought were suspicious for warts. On examination, Goldstein concluded that there was a lesion and surrounding bursitis on the patient's left fourth metatarsal bone, with edema and erythema and several other keratomas, possibly verucca, along with fissuring of the heels on both feet. Goldstein performed a debridement, and prescribed urea cream. Goldstein suggested that the patient consider using orthotics, and that he return in one month. The patient returned to see Goldstein on June 8, 2017, September 12, 2017, March 1, 2018, April 19, 2018, July 10, 2018, September 25, 2018, and January 15, 2019, each time complaining of painful lesions. At each of these visits, Goldstein performed an additional debridement, which Goldstein claimed temporarily relieved the pain.

On January 21, 2020 and May 19, 2020, the patient again presented with painful plantar lesions bilaterally. According to Goldstein, on both of those dates, the patient reported that both feet hurt him when he walked while wearing shoes. Goldstein noted a sub-metatarsal lesion on the bottom of the patient's left foot near the third metatarsal bone that was acutely tender to palpation, and further reported the presence of a hallux abducto valgus, also known as a bunion. Goldstein again performed a debridement, and directed the patient to continue his use of orthotics and to follow up as needed. On July 28, 2020, the plaintiff returned to see Goldstein, complaining of the same painful plantar lesions bilaterally. Goldstein took an X-ray scan, concluding that the left foot lesion corresponded to the third metatarsal head, and he formed an impression of a plantar flexed metatarsal and osteophyte. Goldstein formulated a plan to have the patient continue to use orthotics and follow up as needed.

On October 6, 2020, the patient returned to see Goldstein, again complaining of painful bilateral plantar lesions, after which Goldstein debrided the left-foot lesion. At this visit,

**805046/2022  SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No.  002**

Page 2 of 27

Goldstein recommended surgery to treat the ongoing left-foot pain, and discussed scheduling surgery for a partial metatarsal head resection, including the plantar condyles. According to Goldstein, he discussed the nature of the surgery with the patient at this visit, the approach that would be taken, how to access the plantar condyles, and the risks of the procedure, and that the patient understood that the alterative to surgery was to continue to shave the calluses down. The patient explicitly denies that Goldstein provided such detailed information. As Goldstein recounted it, on November 24, 2020, the patient presented for a telemetry video visit, during which Goldstein further discussed the upcoming surgery with the patient, including the surgical approach, the potential for numbness and swelling, possible stiffness of the digits, recurrence, transfer lesions, and the possibility that the surgery would be unsuccessful in reducing the lesion. The patient contradicted Goldstein's version of this conversation, asserting that Goldstein only indicated that the surgery was a "basic" procedure. Goldstein inferred that the patient had a "good understanding" of the surgery, and averred that peri-surgical process was discussed. In the days leading up to surgery, the patient texted Goldstein with further inquiries as to the surgery, confirming that he would be put under anesthesia, but that he would be discharged the same day.

On November 27, 2020, the day of the surgery, the patient, while at Metropolitan Surgery Center, LLC, signed a surgical consent form for an outpatient condylectomy of the third metatarsal bone of the left foot, and presented for surgery. Goldstein's pre-operative diagnosis was "bone spur and hypertrophic condyle, left foot." Goldstein ordered a peri-operative X-ray to confirm the surgical site.

In his operative report, Goldstein indicated that he made a three centimeter (cm) curvilinear incision in the sulcus of the third interspace, and thereafter dissected down to the level of the third MTP joint capsule, which he described as "easily identified." He then made a linear incision on the metatarsal bone on the most lateral surface of the capsule at the flexor plate. Goldstein reported that he thereafter dissected the metatarsal bone to expose the plantar

**805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**                                   **Page 3 of 27**
**Motion No.  002**

3 of 27

surface of the metatarsal into the operative field, and then resected the plantar shelf of the third metatarsal. As Goldstein described it in his report, he used a hand rasp to smooth the plantar surface, then digitally palpated the area to ensure resection of the condyle, and closed deep tissues using 3-0 vicryl suturing, closed the subcutaneous tissues with 4-0 vicryl suturing, and closed the skin with 2-0 prolene suturing. Goldstein removed a tourniquet that he had previously placed and, once he noted perfusion, he transferred the patient out of the operating room, and reported no complications and no indication of retraction.

On December 8, 2020, the patient returned to see Goldstein for his first post-operative visit. At this appointment, the patient was wearing a surgical shoe, and complained of mild pain. According to Goldstein, although the digits were severely edematous, and there was some swelling across the left foot, with tenderness to palpation of the edematous portions of the foot dorsally and plantarly, the patient was "neurovascularly intact and doing well," and there were no signs of infection. Goldstein removed every second suture in the plantar left foot, and the foot was re-dressed with light dressing. Goldstein asserted that he informed the patient that the latter could begin wearing shoes as tolerated, so long as the dressing was left intact, and alleged that he directed the patient to refrain from showering or bathing the left foot. On December 15, 2020, when the patient returned to see Goldstein, he still was wearing a surgical shoe. As Goldstein recounted it, the patient presented with significant edema, limited range of motion, well coapted skin, swelling across the left foot, and tenderness to palpation of the edematous portions of the foot dorsally and plantarly, but nonetheless was "doing well with an intact neurovascular status," and evinced no signs of infection. Goldstein removed all remaining sutures, recommended that the patient continue wearing the surgical shoe, and advised the patient that he could begin bathing the foot. Goldstein further recommended that the patient begin a regimen of deep-tissue massage on the dorsal aspect of the left foot, and to see him again in three weeks.

**805046/2022  SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**                    **Page 4 of 27**
**Motion No.  002**

[* 4]                                                    4 of 27

On February 9, 2021, or eight weeks later, the patient again saw Goldstein for a post-operative follow-up examination. At this appointment, the patient reported that his third toe was stiff and painful to the touch. Upon examination, Goldstein noted that the patient had no range of motion in the third toe on the left foot, and indicated in his notes that, while there was a concern for a rupture, the toe was not elevated and remained exactly in rectus with the other toes. Goldstein further noted his concern for the possible presence of scar tissue affecting the toe. He directed the patient to continue with range-of-motion exercises, deep-tissue massage to address the scar tissue, and return to wearing regular shoes as tolerated. According to Goldstein, he discussed the potential need for additional surgical intervention with the patient at this visit. On that same date, Goldstein ordered an X-ray. Goldstein interpreted the scan as revealing no evidence of fracture or dislocation, and reflecting that all toes were rectus. Goldstein formulated a plan to have the patient undergo a magnetic resonance imaging (MRI) scan one month later to rule out a tendon rupture in the flexor digitorum longus toe. As Goldstein recounted it, he recommended that the patient return to see him for a follow-up visit.

On March 2, 2021, the patient presented orthopedic surgeon Andrew J. Elliott, M.D, complaining of left forefoot discomfort. As set forth in Dr. Elliott's records, the patient reported that, since the time when Goldstein performe surgery, the third toe on his left foot was lax and continued to bother him "with an unusual feeling, not necessarily pain." Dr. Elliott's notes reflected that his physical examination of the patient revealed that the toe was floating a bit, with a slightly thickened scar plantarly. The plaintiff underwent a computed tomography (CT) scan that day which, according to Goldstein, indicated that the tendon silhouettes were intact. An MRI scan, taken on March 17, 2021, revealed immature hypertrophic incomplete scar remodeling and fibrosis about the joint capsule and plantar plate, extending into the second and third web spaces, and a "disruption" to the flexor tendon to the third toe, with an edematous hyperintense frayed and retracted stump, seen at the level of the proximal forefoot.

**805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No.  002**

Page 5 of 27

5 of 27

On April 14, 2021, the patient presented to orthopedic surgeon Mark C. Drakos, M.D., at the Hospital for Special Surgery for a further evaluation of his left foot, complaining of a pain level of 5 on a scale of 10. Dr. Drakos reported that that the plaintiff was able to fully flex his toes and that, on physical examination, the patient was in no acute distress and able to walk heel to toe, with strength on dorsiflexion, plantarflexion inversion, and eversion all at a level of five on a scale of five, despite the patient's inability fully to flex the third, fourth, and fifth left toes. On that date, radiologist Carolyn Sofka, M.D., took an X-ray of the patient's left foot, reviewed the March 17, 2021 MRI scan, and prepared a report, in which she concluded that there was a bony irregularity and nonuniform joint-space narrowing, centered at the third MTP joint, which she attributed to postoperative changes, but concluded that the image was negative for a frank cortical break. Specifically, she reported that,

> "[t]here is truncation of the plantar, lateral aspect of the head of the 3rd metatarsal as seen on the oblique view with minimal cortical irregularity and periosteal new bone formation corresponding to the MR findings. Negative for frank cortical break.

> "There is mild bony remodeling of the base of the 3rd proximal phalanx, plantarly and laterally. There is nonuniform narrowing of the 3rd MTP joint.

> "There is dorsal osteophyte formation involving the head of the talus."

The bone was not fully healed at that time. Dr. Drakos concluded that the patient had sustained a tear of the plantar plate, and discussed further surgery with the patient.

The patient next saw Dr. Drakos on May 6, 2021 for a telehealth visit, at which time Dr. Drakos reviewed the March 17, 2021 MRI scan. Although Dr. Drakos did not note any obvious fractures, he concluded that the scan revealed a tear of the left plantar plate of the third metatarsal head.

On September 28, 2021, an MRI of the patient's left ankle was taken, which revealed the presence of indicated posterior tibial tendinosis. According to Goldstein, the radiology report stated that the long medial flexor tendons were intact.

**805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No.  002**

Page 6 of 27

6 of 27

[* 6]

On October 21, 2021, to correct a left third hammertoe and plantar plate tear, Dr. Drakos performed a left third metatarsal shortening osteotomy, MTP joint relocation, third longus to brevis extensor tendon transfer, and third proximal interphalangeal joint arthroplasty on the patient. The operative report indicated that one stitch was placed in the plantar plate.

### III. THE PLAINTIFFS' ALLEGATIONS

In their complaint, the plaintiffs alleged that Goldstein was negligent and careless in the medical and surgical care and treatment that he provided to the patient. They further alleged that Goldstein failed to inform the patient of the risks, hazards, and alternatives connected with the treatment rendered, so that an informed consent was not given. In this regard, they contended that a reasonably prudent person in the patient's circumstances would not have undergone the treatment if he or she had been fully informed of the risks, hazards, and alternatives connected with the treatment. In addition, the plaintiff Anita Snyder asserted a cause of action to recover for her loss of the patient's companionship and consortium.

In their bill of particulars, the plaintiffs asserted that Goldstein was negligent in failing to take a proper history and act upon it, in failing to perform a proper physical examination, and in failing to perform appropriate radiological and laboratory studies. They further asserted that Goldstein committed malpractice by performing a plantar condylectomy without appropriate indication to do so. The plaintiffs also alleged that Goldstein further departed from accepted practice by failing to be aware of the patient's anatomy, specifically, in failing properly to identify and avoid the patient's flexor tendon during surgery and improperly employing a transverse incision by using excessive force during surgery and misdirecting surgical instruments, thus disrupting and damaging that tendon, and thereafter failing to repair it. They faulted Goldstein for causing or contributing to a toe fracture and resulting toe deformity. Moreover, the plaintiffs asserted that Goldstein failed properly to advise and instruct the patient post-operatively or examine him at appropriate post-operative intervals.

**805046/2022  SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**                    **Page 7 of 27**
**Motion No.  002**

7 of 27

In addition, the plaintiffs asserted that Goldstein failed to advise the patient of the risks associated with the plantar condylectomy, including damage to vessels, muscles, tendons, ligaments, and other structures, along with bleeding, infection, and other risks, and that Goldstein did not advise the patient of the benefits of the procedure as compared to the benefits of the alternatives and their risks.

As a consequence of this alleged malpractice and failure to obtain informed consent, the plaintiffs alleged that the patient sustained disruption and tear of the left plantar plate of the third metatarsal head and a deformity laceration of the flexor tendon, with concomitant swelling of the left foot and pain, consisting of "electric shooting"-type sharp pain. They further alleged that the patient suffered from an inability to ambulate, that he became limited in the range of motion of functionality of his foot and toes, and that he sustained a fractured toe and a floating toe with subluxation, resulting in an inability to bear weight on the forefoot, an inability to flex the toes, and scarring. In addition, the plaintiffs alleged that Goldstein's malpractice caused the patient to undergo otherwise unnecessary corrective orthopedic surgery to address those conditions, and the need to undergo otherwise unnecessary physical therapy.

IV.     THE SUMMARY JUDGMENT MOTION

In support of his motion, Goldstein submitted the pleadings, the bill of particulars, transcripts of the parties' deposition testimony, relevant medical and hospital records, the note of issue, an attorney's affirmation, and the expert affirmations of podiatrist Dominic J. Catanese, DPM, and radiologist Mingqian Huang, M.D.

In his affirmation, Dr. Catanese asserted that Goldstein did not depart from good and accepted podiatric practice, and obtained the patient's fully informed consent to the condylectomy. He further concluded that nothing that Goldstein did or did not do caused or contributed to any compensable injury.

Dr. Catanese asserted that Goldstein's initial conservative treatment of the patient's chronic plantar lesions, over a period of four years, followed by the offer to proceed with

**805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**                    **Page 8 of 27**
**Motion No.  002**

8 of 27

surgery, was "squarely within the standard of care," and that Goldstein committed no deviations from the standard of care, either intraoperatively, or with respect to post-surgical care and treatment.

Based on radiological studies, Dr. Catanese opined that the patient sustained a dislocation of the MTP joint, and not a fracture, which was caused, in any event, by some sort of significant post-operative impact to the foot that could not have been caused by casually walking on the foot, a limitation that had been imposed upon the patient at the time that the patient claimed the disruption to the MTP joint or toe. Dr. Catanese thus concluded that the patient suffered from "a healing complication that was likely the result of some traumatic injury to the operated foot, that this trauma occurred between the two last visits with Dr. Goldstein" and, thus, occurred while the patient was on a family vacation in January 2021.

As Dr. Catanese explained it, during the four-year period prior to the subject surgery, Goldstein performed numerous debridements of the patient's plantar lesions, placed padding in patient shoes, and directed the patient to employ custom orthotics. He expressly stated that, after more than four years of conservative treatment, at the conclusion of which the patient expressed his desire not to undergo continual retreatment of a recurring condition, "it was reasonable and within the standard of care for Dr. Goldstein to suggest surgery as a means of addressing the plaintiff's chronic lesions, and the disruption to his daily life by having to come into the doctor's office every several months." Dr. Catanese further averred that Goldstein's plan to proceed with the plantar condylectomy approach was an "appropriate surgical technique" to address a plantar lesion in or around the third metatarsal area. He stated that Goldstein committed no departures from proper surgical technique intra-operatively. According to Dr. Catanese, in connection with a condylectomy of the left third metatarsal, it is "only required that the structures that are specifically being operated on be referenced" in the operative report. He continued, stating that "[t]he fact that the flexor tendon is not referenced in the report does not mean that any portion thereof that would have been encountered during the

**805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No.  002**

**Page 9 of 27**

9 of 27

[* 9]

surgery would have been ignored." Dr. Catanese asserted that there was no evidence that Goldstein severed the flexor tendon during the procedure and thereafter failed to appreciate that the tendon was severed before closure. Moreover, he concluded that there was "no proof of a complete or partial iatrogenic injury to the flexor tendon during this surgery."

Dr. Catenese explained that, if the patient's flexor tendon had been severed, the toe to which it was attached would significantly pop up or float very shortly after surgery, a condition that would have been evident no later than the patient's second post-operative visit. Inasmuch as Dr. Catanese asserted that his review of post-operative records and imaging revealed no such floating during that time frame, and further revealed that the toe remained "in rectus relationship" to the other toes, as demonstrated on X-ray imaging, the patient's flexor tendon was not transected. In this regard, he further noted that the patient testified to having no short-term post-operative problems with the toe, and that any problems started at least one month, and upwards to two months, after the November 2020 surgery. Moreover, Dr. Catanese noted that Dr. Sofka, in her reading of the March 2021 MRI scan, nowhere mentioned a severed or transected tendon, but only a retracted stump, which he opined would be "consistent with a partially torn tendon where the partially torn area retracted." Dr. Catanese expressly concurred with this reading. Inasmuch as Dr. Sofka described this portion of the tendon as having fibers that were "frayed," Dr. Catanese concluded that such a condition was inconsistent with an iatrogencially caused transection injury in which a patient's tendon was cut with a surgical instrument. Although Dr. Catanese conceded that the patient's toe might have begun to "float" weeks after the surgery, the late development of that condition was consistent with degenerative, post-operative breakdown of the flexor tendon or a post-operative trauma, but not with an iatrogenic transection injury.

Dr. Catanese opined that Goldstein employed an appropriate and acceptable surgical technique that involved accessing the edge of the plantar plate to reach the structures on which he operated. Although he conceded that this technique could lead to a minimal disruption to the

**805046/2022 SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No. 002**

Page 10 of 27

10 of 27

plantar plate and the flexor tendon, such a minor disruption would not require surgical repair, "as tendons are known to heal well secondarily." He explained that the flexor tendon branch that leads to the third metatarsal is very thin and akin to braided rope and, that, accordingly, it would not be proper to suture such a tendon if it had been damaged, nor would the use of mesh be appropriate. According to Dr. Catanese, only if the tendon had been completely severed, which was not the case here, would a repair or graft be considered.

Dr. Catanese also concluded that, at the patient's December 15, 2020 post-operative visit with Goldstein, it was within the standard of care for Goldstein to instruct the patient to return in three weeks to further assess the foot. He asserted that his conclusion that the patient's later problems with the toe were due to a post-operative trauma was further bolstered by the presence of "a graphic difference in the plaintiffs' complaints, and Dr. Goldstein's examinations, after the plaintiff returned on February 9, 2021." Dr. Catanese further opined that it was reasonable for Goldstein to document his concern for a possible injury to the flexor tendon in light of Goldstein's observations, and it was reasonable for Goldstein to further question why the injury would be occurring several months after the surgery in light of the fact that the toe had not "floated" at prior visits. As such, Dr. Catanese concluded the recommendation for an MRI scan and possible consideration of further surgical intervention was appropriate. He also noted that the patient's delays in seeking further surgical intervention from other health-care providers "may" have led to a worsening of the condition.

Dr. Catanese speculated that, at some point after the December 15, 2020 visit with Goldstein, the patient was not utilizing his surgical boot and was engaging in unsanctioned activities, or had an accident that was not reported, that caused significant stress on the joint, injuring both the MTJ and the flexor tendon. He stated that this conclusion was further supported by the fact that the patient's third toe was slightly longer than normal, a condition that would cause more stress on the toe if the patient were to walk without a surgical boot. Dr. Catanese asserted that the failure to wear the boot would not, by itself, cause sufficient stress to

**805046/2022  SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**  **Page 11 of 27**
**Motion No.  002**

11 of 27

dislocate the joint and acutely inure the flexor tendon, but nonetheless would make the patient more prone to injury by virtue of an accident or high-impact physical activities.

As Dr. Catanese noted, Dr. Drakos's surgery, performed more than eight months after Goldstein's surgery, did not directly address the flexor tendon which, in turn, is not discussed in the MRI reports upon which Dr. Drakos relied. Dr. Catanese further noted that, while Dr. Drakos did intentionally cut some extensor tendons to take pressure off of them, he did not attempt to repair the flexor tendon, or even comment upon it in his operative report. He thus opined that the toe was still in the healing process when Dr. Drakos operated on it, and that a large part of the patient's foot problems were related to unpredictable scar-tissue buildup following Goldstein's surgery, which he characterized as a known risk of surgery, and that those problems were not as the result an iatrogenic injury caused by a transected or severed flexor tendon.

Upon his review of the medical records and the parties' deposition testimony, Dr. Catenese concluded that Goldstein conducted more than one informed consent conversation with the patient and the patient's wife, in which all risks, benefits, and alternatives, including healing risks, were discussed. Dr. Catanese thus opined that Goldstein obtained the patient's fully informed consent to the subject surgical procedure.

Dr. Huang reviewed all of the patient's radiology imaging, inclusive of all X-ray images, as well as an MRI of the forefoot taken March 17, 2021, and an MRI of the left ankle taken on September 28, 2021. She opined that the patient never sustained a severed or resected third flexor tendon, and that there was no damage that would have prevented the patient from moving his third and fourth toes, other than as a result of scar-tissue buildup. She further noted a dislocation of the MTP joint, but not a fracture, which she concluded "had to have been caused by degradation of the joint due to the plaintiff's chronic condition combined with an impact trauma to the foot beyond normal ambulation of post-operative foot."

As Dr. Huang explained, it takes a great deal of impact to dislocate an MTP joint, even one recently operated upon. Moreover, she concluded that the imaging revealed "a diseased

**805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No.  002**

Page 12 of 27

flexor tendon," likely as a result of years of chronic pressure being placed upon it by the formation of plantar lesions. Further, Dr. Huang asserted that the patient's third toe was elongated, which she averred "can contribute to degeneration over a period of years by additional stress being placed on the tendon while ambulating with plantar lesions," and made the patient more prone to injury. She contended that trauma sufficient to dislocate the MTP joint would also be likely to cause an acute injury to the associated flexor tendon as well.

According to Dr. Huang, the flexor tendon was not severed or resected, but instead revealed a simple "disruption" in two places, thus reflecting that the tendon was intact, but damaged. As she explained it, when a tendon is severed, there is a visual complete retraction of the tendon, and there was no such retraction of the full tendon visualized on the films that she reviewed. She stated that, rather, only a portion of the tendon retracted proximally towards the thicker portion of the flexor tendon, which she presumed was what Dr. Sofka referred to as a "stump." Dr. Huang asserted that it would be highly unlikely if the patient's later problems with his foot and toe constituted an iatrogenic injury caused by a surgical tool where, as here, there was a partial tendon disruption with the presence of some fraying tendon strands. Rather, she explained that such an injury would usually be clean, without fraying at the edges, and would not appear as the patient's toe and foot appeared on the subject imaging.

Dr. Huang further opined that the patient's flexor tendon was not injured as a result of rasping of the bone done during the condylectomy, which would entail the tendon degrading and tearing as a result of rubbing up against rough bone. As she explained it, the flexor tendon is spatially very far from the bone rasped and separated by both tissue and muscle and, hence, the presence of the tissue and muscle makes it highly unlikely that the tendon could rub on the bone.

According to Dr. Huang, it was likely that the patient's chronic lesions on the bottom of his foot were causing pressure on the flexor tendon for years, causing it to become unhealthy. She stated that her conclusion in this regard was supported by her visualization of the March

**805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No.  002**

**Page 13 of 27**

[* 13]

13 of 27

17, 2021 MRI, in which the tendon did not appear healthy, as opposed to the subsequent September 28, 2021 MRI of the left ankle, on which, subsequent to Dr. Drakos's surgery, it appeared to be healthy. Dr. Huang also concluded that any damage to the patient's third flexor tendon would not affect his ability to move both his third and fourth toes. In this regard, she stated that the third flexor tendon is unrelated to the fourth digit and, thus, would not affect the potential for movement of that digit, although the fourth toe could be affected by the buildup of scar tissue in that area, as noted on the MRI. She further opined that, although Drs. Elliott and Drakos noted some floating of the patient's third toe in the months after Goldstein's surgery, that condition was neither demonstrated nor visualized on the X-rays or MRIs. As Dr. Huang described it, if the flexor tendon actually had been transected, not only would the transaction be evident, but so would the popping up of the toe and its misalignment with respect to adjoining digits. To the extent that the March 17, 2021 MRI revealed any injury to the MTP joint capsule, Dr. Huang explained that the MTP joint capsule must be entered to perform a plantar condylectomy, and that capsule injuries are self-healing and an accepted risk of the surgery in any event. She further opined that a capsule injury may take longer to heal if there is any weight bearing on the foot. Dr. Huang thus concluded that the capsule injury, along with ongoing overuse of the foot contrary to Goldstein's instructions, "could have caused" the degradation of the flexor tendon and dislocation of the third MTP joint.

Dr. Huang additionally concluded that the patient was not suffering from tendonitis, inasmuch as there would be visible changes in the heel had tendonitis of the ankle developed as a result of such an altered gait, which would arise from altered weight bearing, and no such changes could be visualized in the 2021 MRI.

In opposition to the motion, the plaintiffs relied on the same pleadings, bill of particulars, transcripts, records that Goldstein had submitted, and also submitted an attorney's affirmation, the expert affirmation of an orthopedist, and the expert affirmation of a radiologist. The plaintiff argued that there were triable issues of fact as to whether Goldstein departed from good

**805046/2022  SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No. 002**

Page 14 of 27

14 of 27

podiatric practice and whether those departures caused or contributed to his injuries and the need for additional surgery.

The plaintiffs' expert orthopedist opined that Goldstein departed from accepted standards of care during the condylectomy procedure by failing to identify, failing to protect, and thereupon injuring the patient's flexor tendon. In this regard, he concluded that those portions of a patient's anatomy that are within the operative field, and easily identifiable, should not be injured if the appropriate steps are taken to identify and protect them. The orthopedist averred that the patient's flexor tendon admittedly was within the operative field, and that Goldstein's departures caused an iatrogenic injury to that tendon and the need for revision surgery. Specifically, the expert opined that Goldstein transected the flexor tendon. The orthopedist further faulted Goldstein for failing to identify the injury to the flexor tendon before finishing the surgery, and that, had he identified the injury to the tendon, it could have been repaired at that time, thus preventing further injuries. The plaintiffs' expert orthopedist further opined that Goldstein failed adequately to discuss the risks and benefits of the procedure with the patient.

In connection with Goldstein's alleged departures from the standard of care during surgery, the plaintiffs' orthopedist asserted that Goldstein's operative report itself reflects that Goldstein failed properly to identify the tendon. As the expert described it, the report, despite its detail in describing the procedure, failed to indicate that the flexor tendon was identified during the surgery, failed to document what, if anything, Goldstein did to protect the tendon, and made no mention of the flexor tendon at all. In light of Goldstein's deposition testimony that it was his custom and practice to document significant aspects of the procedure if he performed them, and that identifying and protecting the tendon were significant aspects of the procedure that he performed on the patient, the plaintiffs' expert concluded that Goldstein's failure to memorialize these steps suggested, if not demonstrated, that Goldstein omitted to perform them here. The expert concluded that this failure constituted a departure from good surgical practice.

**805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No.  002**

**Page 15 of 27**

15 of 27

The expert further opined that, because Goldstein utilized the curvilinear transverse incision method, it was even more imperative that the flexor tendon be identified and protected, as that incision increased the risk of surgical damage to the tendon due to its location. In this regard, the orthopedist noted that, inasmuch as the flexor tendon would have to be in the operative field, it would not sustain damage if the surgeon took all appropriate steps, and that there was no evidence that these appropriate protective steps were taken. Moreover, the orthopedist opined that, had the injury to the tendon been identified at the time of the procedure and prior to closing, the tendon could have been repaired, but was not, preventing the patient from obtaining a better outcome.

The plaintiffs' retained orthopedist concluded that the injury to the patient's flexor tendon was a substantial factor in leading to the patient's ongoing complaints of pain, tenderness, loss of range of motion, and other complaints. The orthopedist stated that, in light of the intra-operative disruption and injury to the tendon during surgery, the patient's problems with his third left toe progressed over time, including floating and bending upwards, and led to the dislocation and nonunion described by Dr. Drakos. In this regard, the plaintiffs' orthopedist asserted that the eventual surgery needed to repair the initial surgery was not one to fix the tendon but to repair the further progression of the deformity due to transected flexor tendon, as, by the time that Dr. Drakos undertook the revision surgery, the repair of the damaged flexor tendon was no longer the focus of the surgery, and tendon repair was no longer possible.

The plaintiffs' expert orthopedist expressly rejected the opinions of both Dr. Catanese and Dr. Huang that the injury that the patient sustained arose from some sort of trauma that he had experienced during his January 2021 Florida vacation. The orthopedist averred that those opinions were speculative, and entirely unsupported by the medical records and the plaintiffs' deposition testimony. This expert asserted that there were no medical records that even remotely suggested any post-surgical trauma or injury, including Goldstein's records from early

**805046/2022  SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No. 002**

**Page 16 of 27**

16 of 27

February 2021. Rather, as the expert explained it, the patient testified that he did nothing while in Florida "other than limp to the pool and back."

The expert orthopedist asserted that,

> "[p]er the operative note and Dr. Goldstein's testimony the procedure was for bone spur and hypertrophic condyle of the left foot. His plan was to cut and shave down the overgrown bone. While not a departure from the standard of care per se, this procedure is antiquated and not often done to treat these issues. Further, during the procedure Dr. Goldstein utilized a curvilinear or transverse incision to access the condyle, instead of the safer dorsal linear incision. The curvilinear or transverse incision increases the risk of damage to the flexor tendon because of the location of the incision."

The expert noted that the patient testified at his deposition that, as early as his first follow-up visit with Goldstein, he was unable to bend his toe and was in severe pain, and that, within a few weeks after surgery, once the bandage was removed, the patient noticed that his toe had a bulge on it, which he reported to Goldstein. The expert further noted that, shortly thereafter, at the follow-up visit of December 15, 2020, the patient was unable to move or bend his third toe, which the patient characterized as mangled and painful. The plaintiffs' expert orthopedist expressly rejected Dr. Catanese's opinion that, had the flexor tendon been transected during surgery, the floating of the patient's toe immediately would have been apparent, and asserted that the fact that the toe was in a rectus position with respect to the other toes at the first two initial post-surgical examinations did not rule out such a transection, particularly in light of the absence of range of motion in that toe. The orthopedist also contradicted Dr. Catanese's opinion that the build-up of scar tissue over the first three weeks subsequent to the surgery was the cause of the patient's bulging toe, or that such a significant build-up was likely.

With respect to Goldstein's notes generated subsequent to the patient's post-vacation February 9, 2021 appointment, the orthopedist noted that Goldstein memorialized therein that "there might be a rupture of the flexor tendon" and a "possible rupture of the tendon." The expert further explained that, although Goldstein did not explicitly observe that the toe was "floating" at that time, "[w]hile floating of the toe can happen with a tendon injury, there can be

**805046/2022 SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No. 002**

Page 17 of 27

[* 17]

17 of 27

an injury or transection absent this floating as well," and that the patient himself characterized

his toe as "bulging." In any event, the expert recounted that, when the patient saw Dr. Elliott

only one month later, that practitioner concluded that the toe was indeed floating.

In response to the opinions of Goldstein's experts that nothing in the radiological imaging

suggested a transection of the flexor tendon, the plaintiffs' orthopedic expert asserted that,

> "[r]etraction of the flexor tendon in my opinion to a reasonable degree of medical
> certainty was caused by the injury to the tendon by Dr. Goldstein during his
> surgery in November. Suggestion by defense experts that the failure of Dr.
> Sofka to specifically mention a severed tendon, is without merit. Radiologists
> mention what they see, meaning that the tendon was injured and retracted, but
> not the cause of that injury or retraction. It is the job of the clinician to compare
> the clinical findings to the findings on radiology. When you look at the clinical
> picture, which was suggestive of flexor injury from the outset, the findings in this
> MRI confirm that clinical picture. This MRI confirms the clinical suspicion of both
> Dr. Goldstein and Dr. Elliot that the flexor was torn. I agree, and opine to a
> reasonable degree of medical certainty it was injured due to the departures of Dr.
> Goldstein discussed."

Specifically, the plaintiffs' expert orthopedist asserted that

> "[f]irst, the MRI shows a tear in the flexor tendon. Second, the MRI looked at
> nearly six months later is not conclusive on whether the tear was partial or
> complete due to the buildup of scar tissue over time. Third, one cannot identify
> the cause of a tear based on the findings of the MRI, whether the tendon was
> frayed or not is irrelevant to determining the cause of the injury."

The orthopedist reasoned that the findings on the MRI that the tendon was damaged "is put

together with the clinical findings" to come to the "most likely conclusion," which was that "this

tendon was injured during initial surgery. The MRI shows the remains of this injury, which

appears to be [a] completely torn and retracted flexor tendon." The orthopedic expert further

opined that, with respect to the September 28, 2021 left ankle MRI that was taken due to what

he characterized as posterior tendonitis, while Goldstein's experts had noted that the long

medial flexor tendons were intact, that was not the same location where the flexor tendon was

severed in the foot, and it was disingenuous of those experts to suggest otherwise.

Based on the patient's deposition testimony, the plaintiffs' expert orthopedist also gave

his opinion that Goldstein did not obtain the patient's fully informed consent to the condylectomy

**805046/2022    SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No. 002**

Page 18 of 27

18 of 27

[* 18]

procedure. The expert noted that, although the patient conceded that Goldstein mentioned some risks, the patient stated that Goldstein made them sound insignificant. In this regard, the orthopedist noted that the only risk that the patient recalled being communicated to him was that there could be some soreness, and that Goldstein represented that the procedure "was the most basic surgery" with "minimal risks." The expert further referred to the patient's testimony that the patient was compelled to text Goldstein to learn whether the surgery was even going to require anesthesia. Neither the patient nor Goldstein himself recalled ever discussing the risk of tendon injury.

In the affirmation of the plaintiffs' retained radiologist, that expert agreed with Dr. Sofka's reading of the March 17, 2021 MRI scan, in which Dr. Sofka concluded that there was a "disruption with proximal retraction of the flexor tendon to the third toe," that is, the third toe flexor tendon was torn and had retracted back towards the heel. The plaintiffs' radiologist expressly rejected Dr. Huang's opinion that the flexor tendon was neither severed nor resected. Rather, the plaintiffs' radiologist asserted that it was his or her view that the scan revealed that,

> "the flexor tendon of the 3rd toe in the left foot was torn and retracted with associated scarring. Whether the flexor tendon is completely torn or almost completely torn is hard to tell on this exam because of the scar tissue that had developed over the approximately four months of time between the surgery in November and the MRI in March. This is because when scar tissue develops, it is difficult to separate the scar from tendon. In my opinion, . . . it appears to be a complete tear. Regardless, whether this exam reveals a complete tear or a nearly complete tear is not dispositive as to whether it had been torn at some time prior to or at the time of the surgery."

The radiologist further asserted that the imaging characteristics alone could not lead to a determination of how the tendon tear occurred, that is, the fact that Dr. Huang characterized the tendon as "frayed" did not rule out the possibility or the likelihood that the tendon was transected during surgery, and did not establish that the disruption to the tendon was caused by a post-surgical traumatic event.

In addition, the plaintiffs' radiologist asserted that it was not possible fully to compare the flexor tendons of the toes on the March 17, 2021 MRI forefoot scan to the September 28, 2021

**805046/2022 SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD** Page 19 of 27
**Motion No. 002**

[* 19]

19 of 27

MRI ankle scan because the imaging was obtained from different parts of the foot. Nonetheless, the radiologist asserted that, since there was a small overlap in the areas of the foot that were imaged, the limited portion of the tendons included in that overlap can be compared. In the radiologist's opinion, the third toe flexor tendon was abnormal on the March 17, 2021 MRI scan because it was torn and retracted, while the flexor tendons of the other toes on both the March 17, 2021 and September 28, 2021 MRI images remained normal. With respect to the claims of tendonitis, the radiologist noted that there was a marker over the medial part of the foot, which is generally an indicator of where a patient was complaining of pain. Upon reviewing the September 28, 2021 MRI scan, the radiologist concluded that that there was tendonitis at that time at the insertion of the posterior tibial tendon of the left ankle.

In reply, Goldstein submitted an attorney's affirmation, in which counsel argued that the plaintiff did not address the issue of whether the condylectomy was indicated in the first instance and that, consequently, Goldstein should be awarded summary judgment dismissing any medical malpractice claim premised upon the performance of a non-indicated procedure. She also asserted that a torn flexor tendon was a known and accepted risk of the surgery, and further argued that the plaintiffs failed to raise a triable issue of fact as to whether the condition of the patient's MTP joint or tendonitis was proximately caused by Goldstein's acts or omissions.

V.      SUMMARY JUDGMENT STANDARDS

It is well settled that the movant on a summary judgment motion "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985] [citations omitted]). The motion must be supported by evidence in admissible form (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]), as well as the pleadings and other proof such as affidavits, depositions, and written admissions (*see* CPLR 3212). The facts must be viewed in the light most favorable to the non-moving party (*see Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012]). In other words, "[i]n determining whether

summary judgment is appropriate, the motion court should draw all reasonable inferences in favor of the nonmoving party and should not pass on issues of credibility" (*Garcia v J.C. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept 1992]). Once the movant meets his or her burden, it is incumbent upon the non-moving party to establish the existence of material issues of fact (*see Vega v Restani Constr. Corp*., 18 NY3d at 503). A movant's failure to make a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*see id.; Medina v Fischer Mills Condo Assn*., 181 AD3d 448, 449 [1st Dept 2020]).

"The drastic remedy of summary judgment, which deprives a party of his [or her] day in court, should not be granted where there is any doubt as to the existence of triable issues or the issue is even 'arguable'" (*De Paris v Women's Natl. Republican Club, Inc.,* 148 AD3d 401, 403-404 [1st Dept 2017]; *see Bronx-Lebanon Hosp. Ctr. v Mount Eden Ctr*., 161 AD2d 480, 480 [1st Dept 1990]). Thus, a moving defendant does not meet his or her burden of affirmatively establishing entitlement to judgment as a matter of law merely by pointing to gaps in the plaintiff's case. He or she must affirmatively demonstrate the merit of his or her defense (*see Koulermos v A.O. Smith Water Prods*., 137 AD3d 575, 576 [1st Dept 2016]; *Katz v United Synagogue of Conservative Judaism*, 135 AD3d 458, 462 [1st Dept 2016]).

### A. MEDICAL MALPRACTICE BASED ON ALLEGED DEPARTURES FROM GOOD PRACTICE

"To sustain a cause of action for medical malpractice, a plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury" (*Frye v Montefiore Med. Ctr*., 70 AD3d 15, 24 [1st Dept 2009]; *see Foster-Sturrup v Long,* 95 AD3d 726, 727 [1st Dept 2012]; *Roques v Noble*, 73 AD3d 204, 206 [1st Dept 2010]; *Elias v Bash*, 54 AD3d 354, 357 [2d Dept 2008]; *DeFilippo v New York Downtown Hosp*., 10 AD3d 521, 522 [1st Dept 2004]).

To make a prima facie showing of entitlement to judgment as a matter of law, a defendant physician moving for summary judgment must establish the absence of a triable

805046/2022    SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD
Motion No.  002

Page 21 of 27

21 of 27

issue of fact as to his or her alleged departure from accepted standards of medical practice (*Alvarez v Prospect Hosp*., 68 NY2d 320, 324 [1986]; *Barry v Lee*, 180 AD3d 103, 107 [1st De[t 2019]; *Frye v Montefiore Med. Ctr*., 70 AD3d at 24) or establish that the plaintiff was not injured by such treatment (*see Pullman v Silverman,* 28 NY3d 1060, 1063 [2016]; *McGuigan v Centereach Mgt. Group, Inc*., 94 AD3d 955 [2d Dept 2012]; *Sharp v Weber*, 77 AD3d 812 [2d Dept 2010]; *see generally Stukas v Streiter*, 83 AD3d 18 [2d Dept 2011]).  To satisfy the burden, a defendant must present expert opinion testimony that is supported by the facts in the record, addresses the essential allegations in the complaint or the bill of particulars, and is detailed, specific, and factual in nature (*see Roques v Noble*, 73 AD3d at 206; *Joyner-Pack v Sykes*, 54 AD3d 727, 729 [2d Dept 2008]; *Koi Hou Chan v Yeung*, 66 AD3d 642 [2d Dept 2009]; *Jones v Ricciardelli*, 40 AD3d 935 [2d Dept 2007]).  If the expert's opinion is not based on facts in the record, the facts must be personally known to the expert and, in any event, the opinion of a defendant's expert should specify "in what way" the patient's treatment was proper and "elucidate the standard of care" (*Ocasio-Gary v Lawrence Hospital,* 69 AD3d 403, 404 [1st Dept 2010]).  Stated another way, the defendant's expert's opinion must "explain 'what defendant did and why'" (*id*., quoting *Wasserman v Carella*, 307 AD2d 225, 226 [1st Dept 2003]).  Moreover, as noted, to satisfy his or her burden on a motion for summary judgment, a defendant must address and rebut specific allegations of malpractice set forth in the plaintiff's bill of particulars (*see Wall v Flushing Hosp. Med. Ctr*., 78 AD3d 1043 [2d Dept 2010]; *Grant v Hudson Val. Hosp. Ctr.*, 55 AD3d 874 [2d Dept 2008]; *Terranova v Finklea*, 45 AD3d 572 [2d Dept 2007]).

Once satisfied by the defendant, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact by submitting an expert's affidavit or affirmation attesting to a departure from accepted medical practice and/or opining that the defendant's acts or omissions were a competent producing cause of the plaintiff's injuries (*see Roques v Noble*, 73 AD3d at 207; *Landry v Jakubowitz*, 68 AD3d 728 [2d Dept 2009]; *Luu v Paskowski*, 57 AD3d 856 [2d Dept 2008]).  Thus, to defeat a defendant's prima facie showing of entitlement to judgment as a

**805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No.  002**

**Page 22 of 27**

22 of 27

matter of law, a plaintiff must produce expert testimony regarding specific acts of malpractice, and not just testimony that contains "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice" (*Alvarez v Prospect Hosp.,* 68 NY2d at 325; *see Frye v Montefiore Med. Ctr.*, 70 AD3d at 24). In most instances, the opinion of a qualified expert that the plaintiff's injuries resulted from a deviation from relevant industry or medical standards is sufficient to preclude an award of summary judgment in a defendant's favor (*see Murphy v Conner*, 84 NY2d 969, 972 [1994]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24).

Goldstein demonstrated, prima facie, with his expert podiatrist's affirmation and his own deposition testimony, that he did not depart from good and accepted podiatric practice by performing a non-indicated procedure. Inasmuch as the plaintiffs' expert orthopedist did not address this claim, Goldstein is entitled to summary judgment dismissing the claim that he committed malpractice because he performed a non-indicated procedure.

Contrary to the plaintiffs' contention, however, Goldstein also demonstrated his prima facie entitlement to judgment as a matter of law dismissing the claim that he improperly performed the condylectomy by failing to visualize and protect the patient's third left-toe flexor tendon, by transecting or excessively disrupting that tendon during surgery, and that he failed to notice such a transection or disruption intra-operatively in time to repair it. Goldstein's proof in this regard was more than mere surmise or conjecture, as his experts explicitly asserted that the "frayed" appearance of the tendon on a post-operative MRI scan undercut the plaintiffs' contention that the tendon was transected, and that the development of "floating" more than several weeks after the surgery suggested the likelihood of an unrelated post-surgical trauma. Goldstein also made a prima facie showing that anything that he did nor failed to do did not cause or contribute to the patient's injuries, including the need for additional surgery. The plaintiffs nonetheless raised triable issues of fact as to whether Goldstein departed from good and accepted podiatric and surgical practice with their own experts' affirmation, as well as

**805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No.  002**

**Page 23 of 27**

23 of 27

[* 23]

references to Goldstein's records, which specifically contested the conclusions of Goldstein's experts, and came to contrary conclusions as to whether Goldstein visualized and protected the tendon during surgery, whether the tendon was transected, torn, or severely disrupted during surgery, and whether the patient's complaints of pain and tendonitis, and the need for revision surgery, were proximately caused or contributed to by Goldstein's departure. Consequently, summary judgment must be denied to Goldstein in connection with those claims of podiatric malpractice.

Goldstein failed to establish, prima facie, that any of the patient's alleged failures fully to comply with post-operative instructions caused or contributed to the patient's injuries or need for additional surgery. In any event, Goldstein's allegations that the patient placed too much weight on the left foot, or didn't employ proper shoes, and that these factors caused or contributed to the patient's injuries, were based on surmise and speculation. Hence, that branch of his motion seeking summary judgment on the issue of the patient's comparative fault must be denied.

### B. LACK OF INFORMED CONSENT

The elements of a cause of action for lack of informed consent are:

> "(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury"

(*Spano v Bertocci*, 299 AD2d 335, 337-338 [2d Dept 2002]; *see Zapata v Buitriago*, 107 AD3d 977, 979 [2d Dept 2013]; *Balzola v Giese*, 107 AD3d 587, 588 [1st Dept 2013]; *Shkolnik v Hospital for Joint Diseases Orthopaedic Inst*., 211 AD2d 347, 350 [1st Dept 1995]). For a statutory claim of lack of informed consent to be actionable, a defendant must have engaged in a "non-emergency treatment, procedure or surgery" or "a diagnostic procedure which involved invasion or disruption of the integrity of the body" (Public Health Law § 2805-d[2]). "'[T]his showing of qualitative insufficiency of the consent [is] required to be supported by expert

**805046/2022 SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No. 002**

Page 24 of 27

medical testimony'" (*King v Jordan*, 265 AD2d at 260, quoting *Hylick v Halweil*, 112 AD2d 400, 401 [2d Dept 1985]; *see* CPLR 4401-a; *Gardner v Wider*, 32 AD3d 728, 730 [1st Dept 2006]).

"'The mere fact that the plaintiff signed a consent form does not establish the defendants' prima facie entitlement to judgment as a matter of law'" (*Huichun Feng v Accord Physicians*, 194 AD3d 795, 797 [2d Dept 2021], quoting *Schussheim v Barazani*, 136 AD3d 787, 789 [2d Dept 2016]; *see Godel v Goldstein*, 155 AD3d 939, 942 [2d Dept 2017]). Nonetheless, a defendant may satisfy his or her burden of demonstrating a prima facie entitlement to judgment as a matter of law in connection with such a claim where a patient signs a detailed consent form, and there is also evidence that the necessity and benefits of the procedure, along with known risks and dangers, were discussed prior to the procedure (*see Bamberg-Taylor v Strauch*, 192 AD3d 401, 401-402 [1st Dept 2021]).

Goldstein made a prima facie showing of his entitlement to judgment as a matter of law in connection with the lack of informed consent claim with his submissions, in which he made a showing that he fully discussed the relevant risks, benefits, and alternatives, in addition to securing the patient's signature on a consent form. The plaintiffs, however, through their own submissions, including a transcript of the patient's deposition testimony and his expert's affirmation, raised a triable issue of fact as to whether the consent that Goldstein obtained from him was fully informed and qualitatively sufficient (*see Miller v Mount Sinai Hosp.,* 197 AD3d 1069, 1069 [1st Dept 2021]; *Many v Lossef*, 190 AD3d 721, 724 [2d Dept 2021]; *Gray v Williams,* 108 AD3d 1085, 1085 [4th Dept 2013]; *see also Beckwith v Bowen*, 158 AD3d 1153, 1155 [4th Dept 2018]; *Sarwan v Portnoy*, 51 AD3d 655, 656 [2d Dept 2008]). Specifically, the plaintiffs raised a triable issue of fact as to whether Goldstein did, in fact, clearly and meaningfully discuss with the patient the risks and benefits of, or the alternatives to, the condylectomy procedure and whether, under the circumstances presented here, his mere execution of a consent form constituted a fully informed consent (*see Friedberg v Rodeo*, 193 AD3d 825, 827 [2d Dept 2021] ["The deposition testimony of the parties and the generic consent

**805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**                      **Page 25 of 27**
**Motion No.  002**

25 of 27

forms signed by the plaintiff revealed a factual dispute as to whether (the defendant) failed to disclose reasonably foreseeable risks associated with the treatment that a reasonable medical practitioner would have disclosed in the same circumstances."]). The patient's own testimony raised a triable issue of fact as to whether a reasonable patient would have elected to proceed with the surgery had he been fully informed of the risks, including the possibility of a transected flexor tendon, and alternatives, including continued non-surgical treatment (*see Hugh v Ofodile,* 87 AD3d 508, 509 [1st Dept 2011] ["This Court has held that expert testimony concerning what a reasonable person would have done is not necessary to prosecute a lack of informed consent claim."]; *Andersen v Delaney*, 269 AD2d 193, 193 [1st Dept 2000] [expert testimony is not necessary on the issue whether a reasonably prudent person, fully informed, would not have consented to the treatment]; *Hardt v LaTrenta*, 251 AD2d 174, 174 [1st Dept 1998] [same]; *Osorio v Brauner*, 242 AD2d 511, 512 [1st Dept 1997] [same]; *cf. Orphan v Pilnik*, 66 AD3d 543, 547 [1st Dept 2009] [suggesting otherwise in dicta]).

VI.     CONCLUSION

In light of the foregoing, it is,

ORDERED that motion is granted only to the extent that the defendant is awarded summary judgment dismissing so much of the medical malpractice cause of action as was premised on the claim that plantar condylectomy surgery was not an indicated treatment for the condition presented by the plaintiff Noah Snyder, and the motion is otherwise denied; and it is further,

ORDERED hat the parties shall appear for an initial pretrial settlement conference before the court, in Room 204 of 71 Thomas Street, New York, New York 10013, on May 28, 2024, at 11:00 a.m., at which time they shall be prepared to discuss resolution of the action and the scheduling of a firm date for the commencement of jury selection.

**805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD**
**Motion No.  002**

**Page 26 of 27**

[* 26]

26 of 27

This constitutes the Decision and Order of the court.

| 4/29/2024 | | |
|---|---|---|
| DATE | | JOHN J. KELLEY, J.S.C. |

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | |
|---|---|---|---|
| | ☐ GRANTED ☐ DENIED | ☒ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

805046/2022   SNYDER, NOAH ET AL vs. GOLDSTEIN DPM, RICHARD
Motion No.  002

Page 27 of 27

27 of 27