| **Richman v Lamont** |
|:---:|
| 2024 NY Slip Op 34555(U) |
| December 18, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 805100/2021 |
| Judge: John J. Kelley |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:   **HON. JOHN J. KELLEY**      PART      56M

*Justice*

-----------------------------------------------------------------------------X

AARON RICHMAN,

                      Plaintiff,

               - v -

JUSTIN LAMONT, M.D., NYU LANGONE HEALTH
SYSTEM, and NYU LANGONE HOSPITALS

                      Defendants.

-----------------------------------------------------------------------------X

| INDEX NO. | 805100/2021 |
|---|---|
| MOTION DATE | 10/15/2024 |
| MOTION SEQ. NO. | 003 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 003) 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97

were read on this motion to/for            JUDGMENT - SUMMARY       .

       In this action to recover damages for medical malpractice based on alleged departures from good and accepted practice and lack of informed consent, the defendants move pursuant to CPLR 3212 for summary judgment dismissing the complaint. The plaintiff opposes the motion. The motion is granted to the extent that the defendants NYU Langone Health System and NYU Langone Hospitals (together the NYU defendants) are awarded summary judgment dismissing the complaint insofar as asserted against them, and the defendant orthopedic surgeon Justin Lamont, M.D., is awarded summary judgment dismissing so much of the medical malpractice cause of action, insofar as asserted against him, as was premised on allegations (a) that his purported delay in performing right hip replacement surgery on the plaintiff constituted a departure from good practice, (b) that he "abandoned" the plaintiff postoperatively, (c) that he failed to refer the plaintiff to appropriate specialists, and (d) that the doctrine of res ipsa loquitur is applicable to the facts of this case. Lamont also is awarded summary judgment dismissing any claim that the plaintiff's problems with his urinary system was caused or contributed to by Lamont's conduct. The motion is otherwise denied, as there are triable issues of fact as to

[* 1]

whether Lamont departed from good and accepted practice in his preoperative planning, in making certain intraoperative determinations, as described herein, and in providing postoperative follow-up testing and treatment, whether those departures caused or contributed to a calcar fracture and the need for revision surgery, and whether Lamont obtained the plaintiff's fully informed consent to the right hip replacement surgery.

The crux of the plaintiff's claims is that Lamont departed from good and accepted medical practice by unduly delaying a total hip replacement surgery and that, when he ultimately performed the surgery on March 10, 2020, he performed it improperly, employing prosthetics that did not fit and that were not placed using appropriate techniques, thus requiring removal of the prosthetics and a complete revision surgery. He further alleged that Lamont did not obtain his fully informed consent to the hip replacement procedure.

In his complaint, the plaintiff alleged, in connection with the medical malpractice cause of action, that Lamont improperly performed a right total hip replacement upon failing to appreciate his underlying medical condition at the time of surgery. He asserted, in general terms, that Lamont negligently administered medical care, failed properly to evaluate his condition, failed to monitor him, failed to perform proper physical examinations, and ultimately "abandoned" him without making any attempts to rectify or mitigate his condition. The plaintiff also faulted Lamont for failing to consult with other specialists. In addition, the plaintiff alleged that he intended to rely on the doctrine of res ipsa loquitur. Furthermore, the plaintiff expressly alleged that neither Lamont nor any employee of the two institutional defendants fully informed him of the risks and benefits of a total hip replacement procedure, or of the alternatives thereto.

In his bill of particulars, the plaintiff reiterated the allegations set forth in his complaint in slightly greater detail. He alleged that the delay in performing the surgery caused significant progression of arthritic changes, as well as cervical and lumbar spinal stenosis. The plaintiff also asserted that Lamont employed inappropriately sized hardware for the hip replacement procedure that, in turn, caused him to sustain a periprosthetic fracture of the right proximal

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL
Motion No.  003

Page 2 of 24

femur, a loose femoral component, and a displaced calcar fracture. He further alleged that the defendants departed from good and accepted practice in failing to appreciate the microfractures that he sustained during the surgery, as well as the postoperative instability of the hip, and also deviated from the standard of care in failing properly to monitor him postoperatively, instead continuing to permit him to bear weight on the unstable hip, causing it to deteriorate. The plaintiff additionally asserted that the defendants committed malpractice in failing to call in other specialists for consultation. Moreover, the plaintiff asserted that he also was going to rely on the doctrine of res ipsa loquitur. He averred that all of these departures and instances of malpractice required him to undergo a revision surgery on July 14, 2020, and that, even after that surgery, he experienced postoperative leg pain, a discrepancy in length between his left and right legs, difficulty ambulating, and an exacerbation of his existing psoriasis due to a delay is receiving phototherapy, as well as the need for green-light laser photovaporization treatment to address postoperative problems with urinary retention.

It is well settled that the movant on a summary judgment motion "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985] [citations omitted]). The motion must be supported by evidence in admissible form (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]), as well as the pleadings and other proof such as affidavits, depositions, and written admissions (*see* CPLR 3212). The facts must be viewed in the light most favorable to the non-moving party (*see Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012]). In other words, "[i]n determining whether summary judgment is appropriate, the motion court should draw all reasonable inferences in favor of the nonmoving party and should not pass on issues of credibility" (*Garcia v J.C. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept 1992]). Once the movant meets his or her burden, it is incumbent upon the non-moving party to establish the existence of material issues of fact (*see Vega v Restani Constr. Corp.*, 18 NY3d at 503). A movant's failure to make a prima facie

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL
Motion No. 003                                                                    Page 3 of 24

3 of 24

showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*see id.; Medina v Fischer Mills Condo Assn*., 181 AD3d 448, 449 [1st Dept 2020]).

"The drastic remedy of summary judgment, which deprives a party of his [or her] day in court, should not be granted where there is any doubt as to the existence of triable issues or the issue is even 'arguable'" (*De Paris v Women's Natl. Republican Club, Inc.,* 148 AD3d 401, 403-404 [1st Dept 2017]; *see Bronx-Lebanon Hosp. Ctr. v Mount Eden Ctr*., 161 AD2d 480, 480 [1st Dept 1990]). Thus, a moving defendant does not meet his or her burden of affirmatively establishing entitlement to judgment as a matter of law merely by pointing to gaps in the plaintiff's case. He or she must affirmatively demonstrate the merit of his or her defense (*see Koulermos v A.O. Smith Water Prods*., 137 AD3d 575, 576 [1st Dept 2016]; *Katz v United Synagogue of Conservative Judaism*, 135 AD3d 458, 462 [1st Dept 2016]).

"To sustain a cause of action for medical malpractice, a plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury" (*Frye v Montefiore Med. Ctr*., 70 AD3d 15, 24 [1st Dept 2009]; *see Foster-Sturrup v Long,* 95 AD3d 726, 727 [1st Dept 2012]; *Roques v Noble*, 73 AD3d 204, 206 [1st Dept 2010]; *Elias v Bash*, 54 AD3d 354, 357 [2d Dept 2008]; *DeFilippo v New York Downtown Hosp*., 10 AD3d 521, 522 [1st Dept 2004]). Proof that a hospital failed to follow its own established protocols that had been established to prevent or minimize injury to patients will support a cause of action sounding in medical malpractice (*see Lang-Salgado v Mount Sinai Med. Ctr., Inc.,* 157 AD3d 532, 533 [1st Dept 2018]; *Pacio v Franklin Hosp*., 63 AD3d 1130, 1132-1133 [2d Dept 2009]).

To make a prima facie showing of entitlement to judgment as a matter of law, a defendant physician moving for summary judgment must establish the absence of a triable issue of fact as to his or her alleged departure from accepted standards of medical practice (*Alvarez v Prospect Hosp*., 68 NY2d 320, 324 [1986]; *Barry v Lee*, 180 AD3d 103, 107 [1st Dept 2019]; *Frye v Montefiore Med. Ctr*., 70 AD3d at 24) or establish that the plaintiff was not injured

805100/2021  RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL
Motion No. 003

Page 4 of 24

4 of 24

[* 4]

by such treatment (*see Pullman v Silverman,* 28 NY3d 1060, 1063 [2016]; *McGuigan v Centereach Mgt. Group, Inc*., 94 AD3d 955 [2d Dept 2012]; *Sharp v Weber,* 77 AD3d 812 [2d Dept 2010]; *see generally Stukas v Streiter*, 83 AD3d 18 [2d Dept 2011]).  To satisfy this burden, a defendant must present expert opinion testimony that is supported by the facts in the record, addresses the essential allegations in the complaint or the bill of particulars, and is detailed, specific, and factual in nature (*see Roques v Noble*, 73 AD3d at 206; *Joyner-Pack v Sykes*, 54 AD3d 727, 729 [2d Dept 2008]; *Koi Hou Chan v Yeung*, 66 AD3d 642 [2d Dept 2009]; *Jones v Ricciardelli*, 40 AD3d 935 [2d Dept 2007]).  If the expert's opinion is not based on facts in the record, the facts must be personally known to the expert and, in any event, the opinion of a defendant's expert should specify "in what way" the patient's treatment was proper and "elucidate the standard of care" (*Ocasio-Gary v Lawrence Hospital,* 69 AD3d 403, 404 [1st Dept 2010]).  Stated another way, the defendant's expert's opinion must "explain 'what defendant did and why'" (*id*., quoting *Wasserman v Carella*, 307 AD2d 225, 226 [1st Dept 2003]).  Moreover, as noted, to satisfy his or her burden on a motion for summary judgment, a defendant must address and rebut specific allegations of malpractice set forth in the plaintiff's bill of particulars (*see Wall v Flushing Hosp. Med. Ctr*., 78 AD3d 1043 [2d Dept 2010]; *Grant v Hudson Val. Hosp. Ctr.*, 55 AD3d 874 [2d Dept 2008]; *Terranova v Finklea*, 45 AD3d 572 [2d Dept 2007]).

Once satisfied by the defendant, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact by submitting an expert's affidavit or affirmation attesting to a departure from accepted medical practice and/or opining that the defendant's acts or omissions were a competent producing cause of the plaintiff's injuries (*see Roques v Noble*, 73 AD3d at 207; *Landry v Jakubowitz*, 68 AD3d 728 [2d Dept 2009]; *Luu v Paskowski*, 57 AD3d 856 [2d Dept 2008]).  Thus, to defeat a defendant's prima facie showing of entitlement to judgment as a matter of law, a plaintiff must produce expert testimony regarding specific acts of malpractice, and not just testimony that contains "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements

of medical malpractice" (*Alvarez v Prospect Hosp.,* 68 NY2d at 325; *see Frye v Montefiore Med. Ctr.*, 70 AD3d at 24).  In most instances, the opinion of a qualified expert that the plaintiff's injuries resulted from a deviation from relevant industry or medical standards is sufficient to preclude an award of summary judgment in a defendant's favor (*see Murphy v Conner*, 84 NY2d 969, 972 [1994]; *Frye v Montefiore Med. Ctr*., 70 AD3d at 24).

The defendants established their prima facie entitlement to judgment as a matter of law with respect to the medical malpractice cause of action by submitting the pleadings, the bill of particulars, relevant medical records, the transcripts of the parties' deposition testimony, and a statement of allegedly undisputed material facts, along with the expert affirmation of board-certified orthopedic surgeon Darwin Chen, M.D.

Dr. Chen opined that Lamont appropriately pursued conservative therapy to address the plaintiff's right hip and lumbar spine pain, that Lamont properly referred the plaintiff to appropriate specialists in physical therapy, neurology, and pain management medicine prior to performing the hip replacement surgery, that Lamont did not unnecessarily delay the hip replacement surgery, and that Lamont properly and appropriately performed the surgery within the standard of care.  Specifically, Dr. Chen asserted that Lamont appropriately placed and positioned the prosthetic femoral stem, and that there was no evidence of postoperative fracture or defect seen on the postoperative x-ray films.  He further opined that Lamont did not fail to diagnose, or delay in his diagnosis of, the fracture that ultimately developed, and that any alleged delay did not exacerbate any of the plaintiff's injuries or inhibit his further course of treatment.  Dr. Chen also concluded that nothing that Lamont or the NYU defendants did or did not do caused or contributed to any of the injuries claimed by the plaintiff.

As Dr. Chen interpreted the relevant medical records, as of 2019, the plaintiff previously had undergone left hip replacement surgery, and, on May 8, 2019, first complained of right hip and groin pain to internist Michael Lief, M.D., who ordered x-rays that revealed moderate right hip osteoarthritis with superolateral joint space narrowing, mild underlying right hip dysplasia,

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL
Page 6 of 24
Motion No.  003

[* 6]
6 of 24

and mild uncovering of the lateral femoral head.  He asserted that, when the plaintiff first presented to Lamont on May 16, 2019, complaining that, over the previous five weeks, he had experienced right hip and groin pain, Lamont reviewed a February 19, 2014 bone density scan that reflected minimal osteopenia, and an April 29, 2015 study which revealed that the plaintiff's right femur was within normal limits.  According to Dr. Chen, based on the scans ordered by Dr. Lief, Lamont discussed the possibility of hip replacement surgery with the plaintiff at this first appointment.  As recounted by Dr. Chen, Lamont prescribed the plaintiff the nonsteroidal anti-inflammatory drug Mobic for pain relief, and also referred the plaintiff to rheumatologist Sicy H. Lee, M.D.  Based on his review of the records, Dr. Chen asserted that, at this first appointment, Lamont also fully discussed the risks of a hip replacement procedure with the plaintiff, including the possibility of blood clots, infection, dislocation, leg-length discrepancy, damage to bones, nerves, and blood vessels, nerve injury, and intraoperative or postoperative fracture, with or without trauma, along with the likely postoperative course of recovery.  According to Dr. Chen, Lamont also explained the benefits of the procedure, as well as the alternatives to undergoing the procedure.

As Dr. Chen interpreted the relevant medical records, upon returning to see Lamont on August 7, 2019, the plaintiff reported that ongoing physical therapy worsened his right hip pain, and that the Mobic only slightly helped to alleviate the pain.  According to Dr. Chen, Lamont again discussed right hip replacement surgery, and recommended that the plaintiff undergo a magnetic resonance imaging (MRI) scan of his lumbar spine to rule out lumbar radiculopathy.  On August 9, 2019, the plaintiff underwent the MRI scan which, according to Dr. Chen, revealed multilevel disc and facet joint degenerative disease, along with multilevel neuroforaminal and spinal canal stenosis.

Upon a referral from Lamont, the plaintiff was examined by neurologist Kiril Kiprovski, M.D., on August 20, 2019, who reported his impression that the plaintiff's leg and back pain had been caused by neurogenic claudication, which is a type of lumbar spinal stenosis, and that,

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL              Page 7 of 24
Motion No.  003

7 of 24

while the plaintiff suffered from osteoarthritis, both the pain and gait impairment that the plaintiff experienced were due to that stenosis. Dr. Kiprovski ordered an MRI scan of the plaintiff's cervical spine, which reportedly revealed the presence of multilevel degenerative changes, superimposed upon a congenitally narrow spinal canal. On September 9, 2019, the plaintiff saw pain management specialist Christopher Gharibo, M.D., who administered an epidural injection of pain medication at the L5 level of the plaintiff's lumbar spine. The plaintiff returned to see Dr. Gharibo on September 26, 2019, reporting that his pain initially had improved to a significant degree after the injection, but had returned to its previous level within approximately one week. Dr. Gharibo recommended more physical therapy, the drug Cymbalta for relief from arthritis, and an additional injection of pain medication into his right hip, upon which he referred the plaintiff back to Lamont. The epidural injections continued through November 2019, with little relief for the plaintiff.

The plaintiff returned to Lamont on December 4, 2019. According to Dr. Chen's reading of Lamont's records, Lamont took an x-ray that day, which revealed progression of moderate to severe osteoarthrosis of the right hip, upon which he again discussed hip replacement surgery with the plaintiff. Lamont advised the plaintiff that he would have to wait at least three months after the hip injection before he could be cleared for hip replacement surgery. According to Lamont, he answered all of the plaintiff's questions with respect to the proposed procedure.

On March 10, 2020, the plaintiff presented to NYU Langone Orthopedic Hospital for right hip replacement surgery, and signed a consent form. At his deposition, the plaintiff conceded that he had had discussions in May 2019 with Lamont about the risks and benefits of the procedure, and the alternatives thereto, and that he understood those risks, benefits, and alternatives prior to signing the consent form and proceeding to surgery.

According to Dr. Chen, the plaintiff's hospital chart reflected that Lamont, in performing the surgery, employed a direct, anterior approach "for severe osteoarthrosis of the right hip and loss of articular cartilage on the weightbearing surface." Dr. Chen explained that the chart

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL                    Page 8 of 24
Motion No.  003

8 of 24

further reflected that Lamont employed a low-profile reamer system to "ream up to" 58 millimeters (mm) to fit the acetabular, that is, the "socket," component of the prostheses. As Dr. Chen described the operative notes, Lamont reported that the acetabular component was fitted and "impacted into place" in a "good" position. Lamont further reported that he had been prepared to employ an Anthology brand prosthetic femoral stem, but that, after he broached the femur, he concluded that there would instability if he used this system, and instead elected to employ a prosthetic system manufactured by Synergy Orthotics & Prosthetics, LLC. Hence, according to Dr. Chen's interpretation of the operative report, upon broaching and reaming the femur to accommodate the Synergy stem, Lamont first placed a size 17 Synergy stem, but removed it, and instead placed a size 16 stem because the size 17 stem protruded above the bone, causing excessive leg length. Lamont reported that, after the stem was "impacted" in place, it "was found to be well fixed at a good height." Lamont further reported he then placed a Biolox brand delta prosthetic head, measuring 36 mm, and "gently" aligned the hip, which Dr. Chen characterized as leaving the plaintiff with "excellent clinical leg length, range of motion, and stability." As Dr. Chen described it, the chart indicated that Lamont then closed the incision.

Dr. Chen reiterated Lamont's immediate postoperative characterization of the plaintiff's hip and leg as "excellent" clinical leg length, range of motion, and stability, with no intraoperative fractures. He noted that, after surgery, the plaintiff was taken to the post-anesthesia care unit, and remained as an inpatient at the hospital until March 13, 2020, where he participated in physical therapy activities and was able to walk 150 feet with a wheeled walker. According to Dr. Chen, after the plaintiff was discharged to his home on that date, the plaintiff did not complain of pain, and reported his leg strength as 5 on a scale of 5. The plaintiff's chart reflected that he was prescribed home nursing care and physical therapy.

On April 23, 2020 and, thus, shortly after the onset of the COVID-19 epidemic, Lamont and the plaintiff had a telemedicine conference, during which the plaintiff allegedly reported that

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL
Page 9 of 24
Motion No. 003

9 of 24

he was doing well postoperatively, that his strength was improving, and that he was able to walk with a cane rather than a walker.

On June 19, 2020, the plaintiff underwent a green light prostate laser ablation procedure to shrink his prostate and diminish urinary retention. According to Dr. Chen's interpretation of the chart referable to that surgery, the plaintiff had been placed flat on his back, with his hips and knees flexed to 90 degrees, his hips rotated to 30 degrees, and his calves elevated with padded supports, a position he maintained for approximately one hour. Dr. Chen further described that chart as reporting that the plaintiff remained in the hospital for one full day, and was able to walk with a cane after that procedure.

On July 1, 2020, the plaintiff attended an in-person appointment with Lamont, at which the plaintiff complained that his right leg felt shorter than his left leg. Lamont took an x-ray of the plaintiff's hip, which revealed a displaced fracture of the right proximal femur, running from the greater trochanter, medially to the femoral neck. Lamont thus referred the plaintiff to orthopedic surgeon Scott Marwin, M.D., for revision surgery. Dr. Marwin saw the plaintiff that day, and noted the presence of a loose femoral component due to periprosthetic fracture, reporting that the stem of the prosthetic device had subsided, a condition that could be seen on the x-rays. Dr. Marwin thus concluded that the plaintiff had sustained a displaced fracture of the calcar "around" the stem, and that the stem was loose, with the fracture possibly extending to the greater trochanter, a fracture that he classified as a Vancouver B2 fracture, defined as a fracture just around or below the stem, with a loose stem, albeit with good proximal bone.

Upon Dr. Marwin's recommendation, Dr. Marwin performed revision surgery on the plaintiff at NYU Langone Orthopedic Hospital on July 14, 2020. In his operative report, Dr. Marwin confirmed that the stem had loosened and subsided, and further noted that there was bone loss posteriorly below the lesser trochanter due to fracture, along with an obvious calcar fracture, but no evidence of infection. According to Dr. Marwin, the acetabular, or "socket," component of the prosthetic system was well fixed and did not need to be replaced, and that, in

light of the plaintiff's ongoing osteopenia, the determination to leave the socket intact was warranted. After placing test components to evaluate reducibility, leg strength, stability, and leg length, Dr. Marwin reconstructed the plaintiff's femur, employing a Stryker brand restoration modular stem, "which was impacted aggressively into the femoral shaft with good stability." He thereafter realigned the hip and closed the surgical wound. When post-operative x-rays revealed that the hip was misaligned, Dr. Marwin reopened the wound, and realigned the hip by adjusting the orientation of the femoral head prosthetic, but declined to adjust the socket. The plaintiff remained in the hospital until July 16, 2020.

As Dr. Chen reported, at the plaintiff's first postoperative visit with Dr. Marwin on July 29, 2020, the plaintiff asserted that he was doing well and was able to ambulate with a cane without difficulty, upon which Dr. Marwin cleared him for exercise. The plaintiff returned to see Dr. Marwin on September 30, 2020, at which time he again reported that he was doing well. According to Dr. Chen, x-rays taken at that appointment revealed bilateral total hip prostheses in anatomic alignment, with no evidence of component loosening, albeit with evidence of degenerative changes in the lower spine and the symphysis pubis. Moreover, as Dr. Chen described it, in October 2020, although the plaintiff had no immediate postoperative complaints about his urinary system, he intermittently catheterized himself to assist in urination. After a urologist diagnosed the plaintiff with residual prostate tissue, a transurethral resection of the prostate was performed on November 5, 2020, during which a synechia adhesion was removed, thus achieving an open prostate.

As Dr. Chen conceded, during late 2020 and early 2021, the plaintiff developed chronic right hip and joint pain, numbness in the right thigh, and swelling in the right leg, all of which caused an altered gait pattern and difficulties in his normal activities of living. On May 26, 2021, the plaintiff began rehabilitation therapy at the Hospital for Special Surgery (HSS) under the auspices of orthopedic surgeon Brian Chalmers, M.D. On August 3, 2021, the plaintiff began physical therapy at HSS, along with a regimen of epidural anesthetic injections for pain

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL                    Page 11 of 24
Motion No.  003

11 of 24

management.  During the months that the plaintiff was undergoing physical therapy, he still had a limited range of motion in his right hip, but was able to engage in more strenuous exercises. According to Dr. Chen, by December 20, 2022, the plaintiff reported that he had improved somewhat, was walking distances daily, was able to climb stairs without stopping, and was not suffering from fatigue.

In connection with his opinion that Lamont did not depart from good and accepted medical practice, Dr. Chen asserted that Lamont's initial conservative, nonsurgical approach to the plaintiff's complaints was well within the applicable standard of care, which required an orthopedic surgeon to "exhaust[ ] other conservative remedies."  In this respect, Dr. Chen explained that it was proper to refer the plaintiff to a rheumatologist and a neurologist to rule out rheumatological and neurological causes of his symptoms.  He stated that the referral to Dr. Kiprovski clearly was indicated in light of that physician's determination that spinal stenosis was the likely cause of the plaintiff's spinal pain.  Dr. Chen further concluded that the referral to Dr. Gharibo was indicated since pain-management services were appropriate at that juncture.  In addition, Dr. Chen opined that Lamont's caution did not constitute a negligent "delay" in performing hip replacement surgery.  In this respect, he concluded that, only after a November 2019 scan revealed progressive arthritic changes, and the regimen of injections of painkillers did not fully resolve the plaintiff's pain, did hip replacement surgery become the best option for the plaintiff.  Moreover, Dr. Chen opined that it was within the standard of care to wait the three or so months between the plaintiff's last epidural injection in November 2019, and scheduling the surgery for March 2020, since, by waiting for that interval, the risk of surgical infection was significantly reduced.

Dr. Chen opined that the right hip replacement surgery was indicated, that Lamont properly performed the reaming and fitting process by appropriate incremental progression, that he initially fit and placed both the stem and socket within the applicable standard of care, and that he properly implanted the "cup" portion of the prosthetic device through a "press-fit"

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL
Motion No.  003

Page 12 of 24

method, rather than using cement, since the latter method was contraindicated for patients such as the plaintiff, who evinced significant bone loss. He further stated that Lamont appropriately prepared the plaintiff's femur for placement of the Anthology prosthetic system by employing a broach to shape the interior of the bone to house the prosthetic stem, and appropriately shaped the bone envelope within the femur in a sequential fashion until the desired stem length was achieved, but also properly switched to the longer Synergy implant that Lamont ultimately employed. As Dr. Chen described it, the Synergy prosthetic is straighter, longer, and wider than the equivalent Anthology prosthetic and, thus, able to "fill in gaps in the bone envelope to prevent instability." Dr. Chen concluded that Lamont thereafter properly re-broached and reamed the femoral envelope in order to place the Synergy prosthetic, and properly reduced the width of the stem from a size 17 to a size 16 to accommodate the plaintiff's anatomy, a determination that Dr. Chen characterized as within the standard of care. He further concluded that the size-16 stem was well impacted into the socket, was stable, and did not compromise the surrounding base.

Furthermore, Dr. Chen approved of Lamont's determination to take an x-ray of the hip intraoperatively, as he concluded that such diagnostic testing was within the standard of care and, in fact, revealed no evidence of calcar fracture at that juncture, let alone any fracture. He noted that, even though perioperative fractures were not observable on the scan, those types of fractures were a known risk of the surgery. In any event, Dr. Chen averred that Lamont did not delay in diagnosing the later-occurring periprosthetic fracture when it ultimately developed, since the scheduling of a remote follow-up appointment four weeks after the surgery was within the standard of care, particularly in light of the burgeoning COVID-19 epidemic, and the plaintiff's representations that he was progressing, he wasn't in pain, and he was able to walk with a cane. Hence, Dr. Chen concluded that there was no reason at that time for Lamont to order additional x-rays of the plaintiff's hip. In fact, Dr. Chen opined that it also was within the standard of care for Lamont to schedule the next follow-up appointment for a date two months

805100/2021  RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL
Motion No. 003

Page 13 of 24

after the plaintiff's June 2020 prostate surgery, but that Lamont actually saw the plaintiff in July 2020, and timely and properly diagnosed the periprosthetic fracture at the July 1, 2020 visit. In this respect, Dr. Chen explicitly stated that, prior to this date, there "was no earlier indication of any post-operative complication which Dr. Lamont could have investigated or remedied." He opined that, upon diagnosing the fracture, Lamont appropriately referred the plaintiff to Dr. Marwin for revision surgery.

Dr. Chen expressly stated that nothing that Lamont did or did not do caused or contributed to the fracture or the need for revision surgery. Although clearly opining that Lamont did not negligently delay in scheduling or performing the hip replacement surgery, Dr. Chen also explicitly concluded that, even had Lamont scheduled the plaintiff for immediate surgery in May 2019, the plaintiff would have undergone the exact same surgery, likely with the exact same results. Dr. Chen also asserted that "there was no evidence" that the subject fracture was caused intraoperatively, since x-rays taken immediately after the procedure showed no fractures and a well-placed-and-positioned stem. In this respect, Dr. Chen asserted that,

> "fracture is a known risk in any hip replacement surgery, even absent malpractice, and occurs in less than 1% of patients. Fracture can occur intraoperatively and not be seen on an X-ray, or can occur at a later time, either with or without trauma, such as a twisting injury or a fall. Furthermore, occult fractures can occur either intraoperatively or post-operatively, which are fractures that are not visible on x-ray and the mechanism of injury is unknown.

> *****

> "While plaintiff could have had a fracture without symptoms post-operatively, it is speculation to suggest that a fracture would have been visible on x-ray, had an x-ray been performed after the April 2020 follow up visit. If present at that time, the fracture would likely have been quite subtle given the absence of complaints or pain and the fact that he was ambulating with a cane at that time,"

a course of exercise which Dr. Chen described as "not contraindicated." He thus concluded that the plaintiff sustained an occult fracture at some point, which was not observable or diagnosable until July 1, 2020, that the fracture was not likely sustained during the hip replacement surgery, and that, consequently, Lamont's surgical technique did not cause or contribute to the fracture.

805100/2021  RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL            Page 14 of 24
Motion No.  003

14 of 24

Dr. Chen further asserted that, although he did not believe that there was a delay in diagnosing the fracture, had Lamont actually diagnosed the fracture in April 2020, the appropriate treatment---full revision surgery---would have consisted of the same procedure as the plaintiff in fact underwent, with the same outcome. In addition, Dr. Chen opined that the plaintiff's postoperative complaints of urinary problems were not at all related to the hip replacement surgery, but was caused by the plaintiff's history of renal insufficiency due to hypertension, and his history of an enlarged prostate that had to be corrected in the June 2020 surgery.

In opposition to the defendants' prima facie showing of entitlement to judgment as a matter of with respect to alleged departures from good and accepted medical practice, as well as the issue of proximate cause, the plaintiff raised triable issues of fact with respect to certain departures that he identified in his complaint and bill of particulars, by submitting a counterstatement of material facts, transcripts of the parties' deposition testimony, relevant medical and hospital records, an attorney's affirmation, and the affirmation of board-certified orthopedic surgeon Hubert Riegler, M.D. In general, Dr. Riegler opined that Lamont failed appropriately to conduct preoperative planning, inappropriately performed the right hip replacement procedure, thus causing or contributing to a calcar fracture, ,and failed appropriately to monitor and follow the plaintiff in a postoperative setting. He further concluded that, as a direct result of these departures, the plaintiff was caused to undergo revision surgery on July 14, 2020, as well as to suffer postoperative right leg pain, right leg length discrepancy, change in gait, and overall impairment of his daily living activities. Specifically, Dr. Riegler asserted that Lamont departed from the applicable standards of care in his

> "pre-operative surgical planning, his failure to note or indicate immediate pre-operative/intra-operative trialing, failure to complete a stable restoration of the femoral component, failure to document intraoperative components utilized, and failure to appropriately document the post-operative conditions of the patient including the final visit in question."

With respect to the preoperative setting, Dr. Riegler asserted that Lamont made no notation of the preoperative planning and mapping that was completed just prior to surgical

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL
Motion No. 003

Page 15 of 24

[* 15]

intervention, while the standard of care requires an orthopedic surgeon to take preoperative x-rays and utilize translucent images of various components to best plan for intraoperative decisions. Dr. Riegler asserted that Lamont's failure to complete proper preoperative planning and mapping ultimately led to a "complicated surgical course resulting in the placement of three (3) femoral stems before completion of the restorative surgery." He further concluded that Lamont departed from the accepted standards of medical practice by failing to log which intraoperative components were utilized, or were attempted to be utilized, during the surgical procedure. He continued:

> "Dr. LAMONT noted that the femur canal was opened with a box osteotome and starter broach. An Anthology system was initially used, and the broaching was carried out to a size #10. Following this, Dr. LAMONT noted that there was anterior and posterior instability. The Anthology system utilized was not noted within the operative components, and as such, the details of that system are not available for review by subsequent physicians."

As Dr. Riegler described it, once Lamont had switched from the Anthology prosthetic system to the Synergy system, replaced the size-17 Synergy stem with "12/14 taper short Synergy size 16 stem with a high offset," and noted that the stem "was fixed at a good height and a 36 mm head with a +4 neck length [ ] selected and placed," Lamont made no notation as to what femoral head components had been "trialed" prior to his determination to employ the +4 neck length.

Moreover, Dr. Riegler asserted that the operative report did not mention any use of polymethylmethacrylate (PMMA) bone cement to complete the femoral side of the hip, despite the fact that it evinced instability, and thus disagreed with Dr. Chen that the use of bone cement was not warranted in the plaintiff's case. As Dr. Riegler explained it, in a total hip arthroplasty procedure, a broach is employed to create a channel in the thigh bone for insertion of the femoral implant, and that problems arise when the channel that had been created does not perfectly match the implant that needs to be inserted, which may lead to subsidence, loosening, and fracturing of the proximal part of the femur. He asserted that, in the plaintiff's case, since his femur initially was broached for a size-17 femoral stem, and was replaced with a smaller,

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL                Page 16 of 24
   Motion No.  003

16 of 24

12/14 taper short Synergy size-16 stem, with a high offset stem, "a tight press fit cannot be accomplished without the use of polymethylmethacrylate (PMMA) bone cement or some other modality to ensure a stable construction."  Hence, Dr. Riegler concluded that Lamont departed from the standard of care in failing to ensure that the size-16 femoral stem was securely pressed, and in failing to take additional measures to make certain that the stem was properly secured.  He criticized Dr. Chen for failing to consider, comment upon, or mention whether Lamont himself took into account whether additional intervention was required to make certain that a pressed-fit, size-16 stem placed into a size-17 bored femur was properly implanted.  Dr. Riegler expressly disagreed with Dr. Chen that the employment of bone cement would have increased the likelihood of infection, characterizing Dr. Chen's opinion as "medically incorrect," and explaining that a "tight anatomic fit between the stem and the endosteal surface is a key success factor in uncemented T[otal] H[ip] A[rthroplasty].  When aiming at proximal load transfer with an uncemented femoral component, the stem size has to be selected with regard to the shape of the femoral canal."  He thus concluded that Lamont departed from the standard of care in opting to press fit a size-16 stem into a size-17 femoral canal.

In addition, contrary to Dr. Chen's opinion that the plaintiff's fracture was an "occult" fracture, Dr. Riegler asserted that, when the plaintiff presented to Dr. Marwin, the imaging revealed a subsiding stem with a displaced fracture of the calcar around the stem, that is, at a point near the junction between the femoral shaft and the lesser trochanter, and possibly extending into the greater trochanter, which, coupled with a finding that the stem was loose, provided "radiographic indications that the size 16 stem sunk deeper into the size 17 femoral canal, resulting in instability and more likely than not a fracture to the calcar."  He noted that even Dr. Chen conceded that the size-16 stem did, in fact, "sink further into the bone," upon which Dr. Riegler concluded that the smaller stem "unfortunately sunk further post-surgically resulting in the need for a revision.  As such, the surgical error in not to properly press fit, or otherwise, secure the size 16 stem resulted in the need for the revision surgery by Dr. Marwin."

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL
Page 17 of 24
Motion No.  003

[* 17]
17 of 24

Dr. Riegler also faulted the postoperative care that Lamont provided to the plaintiff, describing it as below the standard of care, and explaining that, despite the COVID-19 pandemic, Lamont failed to follow the plaintiff postoperatively with any diligence. In this respect, Dr. Rieger asserted that,

> "[i]t does not appear from the notes that Dr. LAMONT saw the patient following the March 10th procedure up to the time of his discharge home on March 13th. Moreover, plaintiff had his first follow-up visit with Dr. LAMONT on April 23rd, with no scheduled second post-operative visit. No imaging was completed on April 23rd. There does not appear to be any communication with the patient, nor any indication of additional directives to the patient other than to follow-up after the pending green light prostate ablation surgery.

> "The in person visit of July 1, 2020 resulted in no progress note, opinions or indications by Dr. LAMONT, who was faced with a patient presenting with a subsiding stem, a fracture of the calcar and a stem component noted to be loose. While we can infer that Dr. LAMONT referred the patient to Dr. Marwin for the revision procedure, it does not obviate the fact for the underlying surgeon to also note his findings, differential diagnosis and plan of care. This is a departure from the accepted standards of medical care, and indicative of poor post-operative care."

Dr. Riegler further opined that the Lamont's acts and omissions caused the plaintiff's injuries, and that, specifically, "the lack of pre-surgical planning, poor intraoperative decisions, and subpar post-operative care culminated" in a "subsiding stem, a fracture of the calcar, a loose stem component, and the need for revision surgery, additional physical therapy, and a reduced range of motion." In this regard, Dr. Riegler asserted that the lack of documented preoperative planning resulted in subpar component selection and intraoperative issues, particularly Lamont's determination to place an uncemented, size-16 stem in a femoral bore hole that had been created to accommodate a size-17 stem, which caused the plaintiff to suffer from postsurgical instability as he began to bear weight. He further asserted that, once weight bearing progressed, this narrower size-16 stem moved deeper into the femoral canal, resulting in a subsiding stem, fracture to the calcar, and need for the revision surgery, while the lack of appropriate postoperative follow-up care and imaging failed to note this change in the femoral component, thus culminating in injury to the plaintiff.

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL                    Page 18 of 24
Motion No.  003

18 of 24

Dr. Riegler did not address Dr. Chen's opinions that Lamont did not inappropriately "delay" the surgery, that the type of fracture that the plaintiff sustained could indeed have occurred in the absence of negligence, that Lamont properly referred the plaintiff to appropriate specialists, and that Lamont did not "abandon" the plaintiff, but instead immediately referred him to Dr. Marwin after the fracture was first observed.

In reply to the plaintiff's opposition papers, the defendants submitted an attorney's affirmation, in which counsel argued that Dr. Riegler's affirmation was insufficient to raise a triable issue of fact as to any alleged departure from accepted practice, since it did not elucidate the standard of care with which Lamont purportedly failed to comply, that it was based on speculation and conjecture, that it was conclusory, and that it addressed alleged departures that had not been identified in the plaintiff's bill of particulars.

The court rejects the defendants' characterization of Dr. Riegler's affirmation, and concludes that, although the defendants established their prima facie entitlement to judgment as a matter of law in connection with the medical malpractice cause of action, the plaintiff, through his submissions, including Dr. Riegler's affirmation, raised triable issues of fact as to whether Lamont departed from good and accepted practice in preoperative planning, in employing the press-fit method to place an uncemented, size-16 Synergy stem into a femoral bore hole that had been made to accommodate a size-17 stem, and in providing improper and inadequate postoperative follow-up testing and treatment. Contrary to the defendants' contention, Dr. Riegler's opinion concerning Lamont's failure to employ bone cement when attempting to place a stem smaller in size than the hole into which it was to be placed, thus causing instability and fracture, is but one example of a failure to employ proper placement devices in the proper fashion, which is what the plaintiff alleged in his bill of particulars. Moreover, Dr. Riegler's affirmation raised a triable issue of fact as to whether these alleged departures from the applicable standard of care caused the instability, the fracture, the pain and suffering that the

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL
Motion No. 003
Page 19 of 24

19 of 24

plaintiff experienced during the interval between the initial hip replacement surgery and the revision surgery, and the need for the revision surgery in the first instance.

Nonetheless, inasmuch as the defendants established, prima facie, that the period of time between the plaintiff's first presentation to Lamont and Lamont's performance of the hip replacement surgery was appropriate, and that any such "delay" did not cause or contribute to the plaintiff's injuries, and Dr. Riegler did not address Dr. Chen's opinion in that regard, summary judgment must be awarded to the defendants dismissing so much of the medical malpractice cause of action as alleged that Lamont departed from good and accepted practice by "delaying" the surgery. Moreover, while the defendants established, prima facie, that Lamont cannot be held liable under the theory of res ipsa loquitur, for failing to refer the plaintiff to appropriate specialists, or for "abandoning" the plaintiff, Dr. Riegler did not address these contentions, concluding only that Lamont's postoperative care of the plaintiff was insufficient. Hence, summary judgment must be awarded to Lamont dismissing so much of the medical malpractice cause of action as was premised on those three theories of recovery as well. Furthermore, Dr. Riegler did not address Dr. Chen's opinion that the plaintiff's urinary problems were not at all related to the initial hip replacement surgery or the revision surgery. Hence, Lamont is entitled to summary judgment dismissing any claim that his alleged malpractice caused or contributed to problems with the plaintiff's urinary system.

"'In general, under the doctrine of respondeat superior, a hospital may be held vicariously liable for the negligence or malpractice of its employees acting within the scope of employment, but not for negligent treatment provided by an independent physician, as when the physician is retained by the patient himself'" (*Valerio v Liberty Behavioral Mgt. Corp*., 188 AD3d 948, 949 [2d Dept 2020], quoting *Seiden v Sonstein*, 127 AD3d 1158, 1160 [2d Dept 2015]; *see Hill v St. Clare's Hosp*., 67 NY2d 72, 79 [1986]; *Dupree v Westchester County Health Care Corp*., 164 AD3d 1211, 1213 [2d Dept 2018]). Generally, however, a hospital is not vicariously liable for the malpractice of a private attending physician who is not its employee (*see Mondello*

**805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL**
**Motion No.  003**

Page 20 of 24

*v New York Blood Ctr.-Greater N.Y. Blood Program*, 80 NY2d 219, 228 [1992]; *Fiorentino v Wenger*, 19 NY2d 407, 414 [1967]; *Zhuzhingo v Milligan*, 121 AD3d 1103, 1106 [2d Dept 2014]). In opposition to the defendants' showing that Lamont was not an employee of either of the two NYU defendants, the plaintiff failed to address the issue, and failed to adduce evidence that any employee of the NYU defendants committed an act of malpractice independent from acts allegedly committed by Lamont. Hence, that branch of the defendants' motion seeking summary judgment dismissing the medical malpractice cause of action insofar as asserted against the NYU defendants must be granted.

The elements of a cause of action to recover for lack of informed consent are:

> "(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury"

(*Spano v Bertocci*, 299 AD2d 335, 337-338 [2d Dept 2002]; *see Zapata v Buitriago*, 107 AD3d 977, 979 [2d Dept 2013]; *Balzola v Giese*, 107 AD3d 587, 588 [1st Dept 2013]; *Shkolnik v Hospital for Joint Diseases Orthopaedic Inst*., 211 AD2d 347, 350 [1st Dept 1995]). For a statutory claim of lack of informed consent to be actionable, a defendant must have engaged in a "non-emergency treatment, procedure or surgery" or "a diagnostic procedure which involved invasion or disruption of the integrity of the body" (Public Health Law § 2805-d[2]). "'[T]his showing of qualitative insufficiency of the consent [is] required to be supported by expert medical testimony'" (*King v Jordan*, 265 AD2d at 260, quoting *Hylick v Halweil*, 112 AD2d 400, 401 [2d Dept 1985]; *see* CPLR 4401-a; *Gardner v Wider*, 32 AD3d 728, 730 [1st Dept 2006]). Nonetheless, "expert testimony concerning what a reasonable person would have done in plaintiff's position is not necessary to maintain a cause of action premised upon lack of informed consent" (*Gray v Williams*, 108 AD3d 1085, 1087 [4th Dept 2013]; *see Hugh v Ofodile*, 87 AD3d 508, 509 [1st Dept 2011]; *Andersen v Delaney*, 269 AD2d 193, 193 [1st Dept 2000]).

805100/2021 RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL Page 21 of 24
Motion No. 003

21 of 24

"'The mere fact that the plaintiff signed a consent form does not establish the defendants' prima facie entitlement to judgment as a matter of law'" (*Huichun Feng v Accord Physicians*, 194 AD3d 795, 797 [2d Dept 2021], quoting *Schussheim v Barazani*, 136 AD3d 787, 789 [2d Dept 2016]; *see Godel v Goldstein*, 155 AD3d 939, 942 [2d Dept 2017]). Nonetheless, a defendant may satisfy his or her burden of demonstrating a prima facie entitlement to judgment as a matter of law in connection with such a claim where a patient signs a detailed consent form, and there is also evidence that the necessity and benefits of the procedure, along with known risks and dangers, were discussed prior to the procedure (*see Bamberg-Taylor v Strauch*, 192 AD3d 401, 401-402 [1st Dept 2021]).

Dr. Chen went into great detail in his affirmation in explaining the content of the conversations that the plaintiff had with Lamont during the entire pre-operative period in late 2019 and early 2020. He further noted that the plaintiff, at his own deposition, essentially conceded that he had been informed of all of the risks and benefits of the hip replacement procedure, including fracture, failure of the prosthetic system, and the need for revision surgery.

Dr. Riegler, however, opined that Lamont failed to obtain the plaintiff's fully informed consent to the hip replacement procedure. Specifically, he asserted that Lamont failed properly to obtain the plaintiff's informed consent sufficiently near in time to the March 10, 2020 surgery. As Dr. Riegler explained it, Lamont's records indicated that the plaintiff gave his consent at his first visit to Lamont on May 16, 2019, despite the fact that the surgery was not performed until almost 10 months later, and there is no entry in Lamont's progress notes as to which risks and complications of the procedure had been discussed, and no indication that Lamont discussed these issues with the plaintiff later on. As Dr. Riegler described it, "[o]btaining informed consent for a surgical procedure approximately ten (10) months prior is not within the standard of care." While Dr. Riegler conceded that, in December 2019, there was an indication that Lamont answered the plaintiff's questions regarding the procedure, "there is no indication that the risks, complications, and postoperative course of the total hip procedure was discussed," even three

months prior to the March 10, 2020 surgery. Dr. Riegler contrasted Lamont's conduct in obtaining the plaintiff's consent with that of Dr. Marwin, which Dr. Riegler described as "contain[ing] specific information regarding the informed consent of the patient, the areas of concern, and completed this consent within a reasonable time prior to surgical intervention."

Dr. Riegler further reiterated the rule that a mere signature on an informed consent form by a patient does not amount to proper and accepted medical practice in obtaining informed consent, inasmuch as a patient's own surgical history, the patient's presumed knowledge of how a procedure is done, and knowledge that a patient gained as a consequence of prior similar surgeries, do not amount to informed consent. In this regard, Dr. Riegler noted that the plaintiff, at his deposition, testified that he did not recall any details of the anticipated risks of the procedure that Lamont provided to him, despite numerous specific questions. Dr. Riegler thus concluded that, had the plaintiff been informed of these complications, he would not have consented to the initial surgery, and that, by proceeding with the right hip surgery in the absence of the plaintiff's fully informed consent, the defendants caused or contributed to his injuries.

In his reply affirmation, the defendants' counsel characterized Dr. Riegler's opinion as to the consent that Lamont obtained from the plaintiff as speculative and conclusory.

Inasmuch as the plaintiff's expert did not render any specific opinions that any employees of the NYU defendants had any obligation to obtain the plaintiff's informed consent, those defendants thus are entitled to summary judgment dismissing the lack of informed consent cause of action insofar as asserted against them. The court nonetheless rejects the defendants' characterization Dr. Riegler's opinion with respect to Lamont in this regard. Hence, that branch of the defendants' motion seeking summary judgment dismissing the lack of informed consent cause of action insofar as asserted against Lamont must be denied.

Accordingly, it is,

ORDERED that the defendants' motion is granted only to the extent that summary judgment is awarded to the defendants NYU Langone Health System and NYU Langone

805100/2021   RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL           Page 23 of 24
  Motion No.  003

23 of 24

[* 23]

Hospitals dismissing the complaint insofar as asserted against them, and to the defendant Justin Lamont, M.D., dismissing so much of the medical malpractice cause of action insofar as asserted against him as was premised on allegations (a) that his purported delay in performing right hip replacement surgery on the plaintiff constituted a departure from good practice, (b) that he "abandoned" the plaintiff postoperatively, (c) that he failed to refer the plaintiff to appropriate specialists, and (d) that the doctrine of res ipsa loquitur is applicable to the facts of this case, and dismissing the plaintiff's claim that any wrongful act of Justin Lamont, M.D., caused or contributed to urinary problems, the complaint is dismissed insofar as asserted against the defendants NYU Langone Health System and NYU Langone Hospitals, the aforementioned causes of action and claim is dismissed insofar as asserted against the defendant Justin Lamont, M.D., and the motion is otherwise denied; and it is further,

ORDERED that, on the court's own motion, the action is severed against the defendants NYU Langone Health System and NYU Langone Hospitals; and it is further,

ORDERED that the Clerk of the court shall enter judgment dismissing the complaint insofar as asserted against the defendants NYU Langone Health System and NYU Langone Hospitals; and it is further,

ORDERED that that the remaining parties shall appear for an initial pretrial settlement conference before the court, in Room 204 at 71 Thomas Street, New York, New York 10013, on January 22, 2025, at 11:00 a.m., at which time they shall be prepared to discuss resolution of the action and the scheduling of a firm date for the commencement of jury selection.

This constitutes the Decision and Order of the court.

__12/18/2024__
DATE

JOHN J. KELLEY, J.S.C.

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | | GRANTED | | DENIED | X | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

805100/2021  RICHMAN, AARON vs. LAMONT M.D., JUSTIN ET AL
Motion No. 003

Page 24 of 24

[* 24]