■ ALLISON YUSEFA HUGH, Respondent, v FERDINAND OFODILE, M.D., Appellant. [929 NYS2d 122]—

Plaintiff, then age 38 and weighing 380 pounds, underwent gastric bypass surgery, ultimately losing 200 pounds. After the surgery, she had excess skin on her abdomen, buttocks, and thighs, which caused considerable discomfort from chafing and difficulty walking, and she sought surgery to remove the excess skin from her thighs. Plaintiff consulted with several plastic and reconstructive surgeons. She rejected recommended full body lift surgery because it was too invasive, but was interested in a procedure known as the medial thigh lift. Two surgeons with whom plaintiff consulted in 2003, however, told her that the latter procedure carried a risk of vaginal widening and labial stretching. Plaintiff rejected the medial thigh lift because of that risk. In 2005, she consulted defendant, who she claims indicated that he would perform a lateral thigh lift, making incisions on the outside of her thighs, which would not cause vaginal widening or the flattening of the labia majora often incidental to a medial thigh lift. Plaintiff acknowledged that de-

fendant told her of such risks of surgery as lung collapse, thrombosis, and infection, but claimed that he did not inform her of the risk of vaginal widening or labial distortion.

Defendant ended up performing a medial thigh lift because plaintiff had so much loose skin. Plaintiff was left with flattening of the labia majora and some scarring as a result of wound breakdown. She did not complain to defendant concerning her condition or the type of surgery that had been performed, stating afterward, "He already cut me there. At that time I just, I — I couldn't believe it. I just — I just said okay."

Defendant disputed plaintiff's claim that he did not tell her of the possibility of vaginal widening and labial change incident to his performing a medial thigh lift, which he might have to perform to remove the excess skin from her inner thighs. However, defendant's notes indicate merely that patient "wants thigh lift" and "[needs T-type skin excision" and "understands that skin will stretch and may meloid." The consent form that plaintiff signed did not mention a medial thigh lift or say anything about vaginal widening or labial distortion. Plaintiff also testified that, on the day of surgery, defendant marked only the outside of her hips; defendant testified that he performed the surgery in accordance with the markings he had made before it. Defendant testified that, in his opinion, plaintiff's vagina was "essentially" the same both before and after the surgery, without widening, and was within the normal limits, although the shape was slightly different.

Plaintiff's claims are based on lack of informed consent and deviation from good and accepted medical practice. As to the lack of informed consent, she avers that she would not have undergone the thigh lift had she known that defendant was going to perform a medial lift, which she knew carried the risk of the vaginal condition from which she now suffers. Although plaintiff's expert admitted that this was the most common surgery for a thigh lift, the jury was within its right to credit plaintiff's testimony that she would not have undergone the procedure and to conclude that a reasonable person in plaintiff's position would not have consented to or undergone the procedure had she been properly informed. This Court has held that expert testimony concerning what a reasonable person would have done is not necessary to prosecute a lack of informed consent claim (see *Andersen v Delaney*, 269 AD2d 193 [2000]; *Osorio v Brauner*, 242 AD2d 511 [1997], *lv denied* 91 NY2d 813 [1998]). The jury had the right to disbelieve defendant's claim that he had properly warned plaintiff.

As to the claim based on a departure from good and accepted

medical practice, plaintiff's expert testified that the degree of scarring and flattening showed that defendant removed too much tissue, although the expert acknowledged that such a result could have occurred without any departure. The jury found in plaintiff's favor on both the lack of informed consent claim and the departure claim. In effect, it found that a reasonable person properly informed would not have undergone the surgery. It apparently rejected defendant's expert's conclusion that wound breakdown, caused at least in part by plaintiff's own actions following surgery, was responsible for some of the scarring and altered appearance of the labia. Although the evidence of a departure was not overwhelming, the jury's conclusion does not mandate reversal. A jury verdict should not be set aside unless it could not have been reached on any fair interpretation of the evidence (*Nicastro v Park*, 113 AD2d 129 [1985]).

With respect to damages, plaintiff testified that she commenced a sexual relationship after the surgery at issue but sometimes experiences discomfort during sexual relations. Plaintiff also had complaints of a bladder and yeast infection and uterine prolapse, which led to a referral to Dr. Christina Kwon, a urogynecologist. Dr. Kwon examined plaintiff on three occasions in the period 2006 through 2009 and noted on each occasion that plaintiff had normal external genitalia. At her 2006 visit to Dr. Kwon, plaintiff filled out a form indicating that she had a satisfactory, and usually pain-free, sexual relationship. Dr. Margaret Nachtigall, plaintiff's former gynecologist, testified that the appearance of plaintiff's labia post surgery was not normal, in that the labia appeared to be flush with the thighs. Her records however, only note scarring and do not note an abnormal appearance of the genitalia. Moreover, no physician linked any pain during sexual relations or the bladder infections to the thigh lift surgery. Nor did any physician report vaginal widening. The trial court did not dismiss the claim for vaginal or labial pain although it told plaintiff's counsel that "[t]here really isn't much on that and I'll assume that it will play a very small role in your damages claim." In fact, there wasn't any expert testimony at all relating to physical pain other than some tightness during sexual relations, and that claim for damages therefor should have been limited. Plaintiff's claims for emotional pain as a result of the surgery remain, although it is noted that plaintiff suffered from significant depression before the surgery. However, the dissent's characterization of the photos of plaintiff's labia as showing a complete distortion is at best extremely subjective and not supported by the record.

We find that the reduced damages award is excessive to the

extent indicated, since it deviates materially from what would be reasonable compensation under the circumstances (*see L.S. v Harouche*, 260 AD2d 250 [1999] [where record on appeal shows an 18 year old underwent labial surgery resulting in injuries much more serious than those of the instant plaintiff, and this Court sustained reduced verdict of $1,750,000]; *Rabinowitz v Elimian*, 55 AD3d 813 [2008] [sustaining an award of $750,000 to plaintiff and her husband where the record shows that plaintiff sustained a complete disintegration of her sphincter muscle leading to bowel incontinence]; *Sutch v Yarinsky*, 292 AD2d 715 [2002]; *Beverly H. v Jewish Hosp. & Med. Ctr. of Brooklyn*, 135 AD2d 497, 497-498 [1987]). In these cases, the plaintiffs sustained injuries much more severe than those sustained by the instant plaintiff. Concur—Tom, J.P., Moskowitz and Freedman, JJ.

Catterson and Richter, JJ., dissent in part in a memorandum by Richter, J., as follows: I dissent in part, because I believe the majority has reduced the damages for future pain and suffering to a level that cannot be considered reasonable compensation under the circumstances, although I agree with the reduction to $300,000 for past pain and suffering. I would reduce the award for future pain and suffering to $1,300,000.

After surgery, plaintiff discovered incisions along her groin and on the insides of her thighs, and no incisions along the outside of her thighs where the doctor had marked her before surgery. Just over a week after the thigh lift, plaintiff was hospitalized for 11 days because the wounds from the incisions had broken down, and she had developed an infection. Specifically, her wounds had opened up, were emitting a discharge, and continued to bleed profusely. As a result, plaintiff's external labia became tethered as the skin around the vagina was pulled towards the wound. Plaintiff's vagina is now permanently deformed and disfigured so that the labia appears to be flush with her thighs.

Before the thigh lift, plaintiff enjoyed biking, walking, modeling and socializing. She had recently started her own event planning business, which required her to network and socialize on a regular basis. However, plaintiff's life changed after the thigh lift left her permanently deformed and disfigured. She testified that she no longer wished to be out with other people, which was a big part of her business, and that she experienced deep sadness and depression. Subsequently, plaintiff stopped modeling and, in 2006, dissolved her business. More importantly, plaintiff testified that she experienced pain and discomfort during sexual relations. Specifically, she felt a pulling and tightness

whenever she attempted sexual activity. Although plaintiff was not in a relationship prior to the thigh lift, she began a relationship thereafter, but it was difficult to maintain due to the pain she experienced during intimacy. Plaintiff testified that as a result of her intimacy problems, the relationship assumed an on-again, off-again status, only adding to her emotional pain.

Moreover, plaintiff's deformity cannot be corrected by more surgery. After the thigh lift, plaintiff inquired about corrective surgery; she was told by one doctor to leave her condition alone and move on with her life, as there was nothing that could be done. Although plaintiff's expert doctor informed her that an experimental surgery option might be available, even he was doubtful as to the likelihood of its success. It is clear that the irreversible nature of plaintiff's deformity continues to negatively impact her life in a variety of ways.

In addition to plaintiff's testimony describing her now deformed vagina and the resulting pain, she submitted photographs to show the major disfigurement that resulted from the surgery. The graphic photos show how the skin pulled completely away from her vagina, resulting in the total distortion of both the labia minora and the labia majora. Plaintiff's expert testified, and the pictures show, that the mound of tissue that was once plaintiff's labia minor and majora is now flattened just like regular skin.

The majority incorrectly suggests that it is subjective to describe the photographs as showing a horrible injury. However, plaintiff's gynecologist testified at trial that before the surgery, plaintiff had no labial abnormalities. After surgery, the doctor said the area was flat, like a scar, and when shown the photos, stated it was not a normal vagina. The majority, in questioning the extent of the injury, gives inadequate consideration to the fact that the jury had an opportunity to view the photos and was entitled to credit the gynecologist's testimony that the appearance of the vagina was not normal.

The majority gives short shrift to plaintiff's testimony that sexual relations post surgery were painful, focusing instead on a passing comment made by the trial court when it denied defendant's motion to dismiss. It was entirely reasonable for the jury to conclude that painful sexual relations for someone aged 40 could cause significant future pain and suffering. The majority also notes that plaintiff was depressed, and plaintiff explained that this was due in part to her mother's passing away. But, whatever depression plaintiff had before surgery, it did not prevent her from functioning, and she had started her own business. It is only since the surgery, which resulted in

genital disfigurement, something that can have a lifelong impact, that plaintiff is reluctant to go out and socialize with other people.

The cases relied on by the majority are distinguishable and highlight why plaintiff here should receive a higher amount. In *Sutch v Yarinsky* (292 AD2d 715 [2002]), the jury awarded the plaintiff $800,000 as compensation for a deformed breast that resulted from a bilateral breast reduction. Notably, the plaintiff in *Sutch* had the option of semi-reconstructive surgery to improve the appearance of her breast and nipple. Likewise, in *Beverly H. v Jewish Hosp. & Med. Ctr. of Brooklyn* (135 AD2d 497 [1987]), the jury awarded the plaintiff $1,500,000, which the trial court reduced to $700,000, as compensation for the recto vaginal fistula that developed as a result of a midline episiotomy performed in an effort to shorten the plaintiff's time in labor. There too, the plaintiff had the option of corrective surgery, and by the time the case reached the Second Department, her injury had been substantially corrected.

Plaintiff here does not have the option of corrective surgery. She testified that one doctor informed her that there may be an experimental procedure available, but that it may not be successful. She also testified that another doctor told her there was nothing that could be done. The fact that plaintiff does not have the option of corrective surgery increases the compensation for future pain and suffering that would be reasonable, and thus warrants a higher damages award. Additionally, plaintiff was only 40 years old when the resulting disfigurement occurred. She has a long life ahead of her, yet she will now have to face intimacy problems and pain during sexual relations for several decades.

It is difficult to find a case with analogous facts given the nature of plaintiff's deformity and the lack of a surgical remedy. Nevertheless, an examination of cases decided several years ago shows that the adjusted award here should be higher than the amount set by the majority (*see e.g. Suria v Shiffman*, 107 AD2d 309 [1985], *mod on other grounds* 67 NY2d 87 [1986] [plaintiff was awarded $800,000 as compensation for permanent breast deformity, as well as swelling, infections, and discoloration resulting from improper silicone injections]). Moreover, the award of $1,300,000 for future pain and suffering is still a significant reduction from the jury's original award, and from the trial court's own reduction.