**Boutov v Hanson**

2026 NY Slip Op 31058(U)

March 17, 2026

Supreme Court, New York County

Docket Number: Index No. 805320/2024

Judge: John J. Kelley

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:   **HON. JOHN J. KELLEY**          PART          **56M**

*Justice*

-----------------------------------------------------------------------X

ALEXANDER A. BOUTOV and OLGA BOUTOV,

          Plaintiffs,

      - v -

MATTHEW B. HANSON, M.D., BILLY YANG, M.D., and
UNIVERSITY PHYSICIANS OF BROOKLYN, INC.,

          Defendant.

-----------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 805320/2024 |
| MOTION DATE | 12/11/2025 |
| MOTION SEQ. NO. | 002 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 32, 33, 34, 35, 36, 37, 38, 39, 40, 41

were read on this motion to/for          RENEWAL/JUDGMENT - DEFAULT          .

      This is an action to recover damages for medical malpractice based on alleged departures from good and accepted practice, lack of informed consent, and loss of spousal consortium.  The plaintiffs move pursuant to CPLR 2221(e) for leave to renew their prior motion (MOT SEQ 001) for leave to enter a default judgment on the issue of liability against the defendant United Physicians of Brooklyn, Inc. (UPB), which had been denied without prejudice to renewal in an order dated September 26, 2025.  No party opposes the motion.  The motion is granted and, upon renewal, the plaintiffs are granted leave to enter a default judgment on the issue of liability against UPB, and the matter is set down for an inquest on the issue the damages for which UPB is liable, to be conducted concurrently with the trial of the action against the remaining defendants.

      As explained in this court's September 26, 2025 order disposing of Motion Sequence 001, where a plaintiff moves for leave to enter a default judgment, he or she must submit proof of service of the summons and complaint upon the defaulting defendant, proof of the

805320/2024   BOUTOV, ALEXANDER A. ET AL vs. HANSON M.D., MATTHEW B. ET AL          Page 1 of 11
Motion No.  002

1 of 11

[* 2]

defendant's default, and proof of the facts constituting the claim (*see* CPLR 3215[f]; *Woodson v Mendon Leasing Corp.*, 100 NY2d 62, 70-71 [2003]; *Bigio v Gooding*, 213 AD3d 480, 481 [1st Dept 2023]; *Gray v Doyle*, 170 AD3d 969, 971 [2d Dept 2019]; *Gantt v North Shore-LIJ Health Sys.*, 140 AD3d 418, 418 [1st Dept 2016]; *Atlantic Cas. Ins. Co. v RJNJ Services, Inc.* 89 AD3d 649, 651 [2d Dept 2011]; *see also Manhattan Telecom. Corp. v H & A Locksmith, Inc.*, 21 NY3d 200, 202 [2013]). As the court further determined in that order, the relevant affidavit of service established that UPB was properly served with process, that the affirmation of the plaintiffs' attorney established that UPB did not answer or move with respect to the complaint or appear in the action and that, hence, UPB was in default.

With respect to the proof of the facts constituting the claim, the court explained that,

> "CPLR 3215 does not contemplate that default judgments are to be rubber-stamped once jurisdiction and a failure to appear have been shown. Some proof of liability is also required to satisfy the court as to the prima facie validity of the uncontested cause of action (*see*, 4 Weinstein-Korn-Miller, NY Civ Prac paras. 3215.22-3215.27). The standard of proof is not stringent, amounting only to some firsthand confirmation of the facts"

(*Joosten v Gale*, 129 AD2d 531, 535 [1st Dept 1987]; *see Martinez v Reiner*, 104 AD3d 477, 478 [1st Dept 2013]; *Beltre v Babu*, 32 AD3d 722, 723 [1st Dept 2006]). Stated another way, while the "quantum of proof necessary to support an application for a default judgment is not exacting . . . some firsthand confirmation of the facts forming the basis of the claim must be proffered" (*Guzetti v City of New York*, 32 AD3d 234, 236 [1st Dept 2006]). In other words, the proof submitted must establish a prima facie case (*see id.*; *Silberstein v Presbyterian Hosp.*, 95 AD2d 773 [2d Dept 1983]). "Where a valid cause of action is not stated, the party moving for judgment is not entitled to the requested relief, even on default" (*Green v Dolphy Constr. Co.*, 187 AD2d 635, 636 [2d Dept 1992]; *see Walley v Leatherstocking Healthcare, LLC*, 79 AD3d 1236, 1238 [3d Dept 2010]). In moving for leave to enter a default judgment, the plaintiff must "state a viable cause of action" (*Fappiano v City of New York*, 5 AD3d 627, 628 [2d Dept 2004]). In evaluating whether the plaintiff has fulfilled this obligation, the defendant, as the defaulting

805320/2024   BOUTOV, ALEXANDER A. ET AL vs. HANSON M.D., MATTHEW B. ET AL          Page 2 of 11
Motion No.  002

2 of 11

party, is "deemed to have admitted all factual allegations contained in the complaint and all reasonable inferences that flow from them" (*Woodson v Mendon Leasing Corp.*, 100 NY2d 62, 71 [2003]). The court, however, must still reach the legal conclusion that those factual allegations establish a prima facie case (*see Matter of Dyno v Rose*, 260 AD2d 694, 698 [3d Dept 1999]).

Proof that the plaintiff has submitted "enough facts to enable [the] court to determine that a viable" cause of action exists (*Woodson v Mendon Leasing Corp.*, 100 NY2d at 71; *see Gray v Doyle*, 170 AD3d at 971) may be established by an affidavit of a party or someone with knowledge, authenticated documentary proof, or by complaint verified by the plaintiff that sufficiently details the facts and the basis for the defendant's liability (*see* CPLR 105[u]; *Woodson v Mendon Leasing Corp.*, 100 NY2d at 71; *Gray v Doyle*, 170 AD3d at 971; *Voelker v Bodum USA, Inc.*, 149 AD3d 587, 587 [1st Dept 2017]; *Al Fayed v Barak*, 39 AD3d 371, 371 [1st Dept 2007]; *see also Michael v Atlas Restoration Corp.*, 159 AD3d 980, 982 [2d Dept 2018]; *Zino v Joab Taxi, Inc.*, 20 AD3d 521, 522 [2d Dept 2005]; *see generally Mitrani Plasterers Co., Inc. v SCG Contr. Corp.*, 97 AD3d 552, 553 [2d Dept 2012]). As the court explained it in its prior order, in the context of a medical malpractice action, generally an affidavit or affirmation of merit from an expert is required to support a motion for leave to enter a default judgment, unless the matters alleged are within the ordinary experience and knowledge of a lay person (*see Fiore v Galang*, 64 NY2d 999, 1000-1001 [1985]; *Bollinger v Mark Mordechai Liechtung, DMD, P.C.*, 2023 NY Slip Op 31537[U], *5, 2023 NY Misc LEXIS 2231, *6 [Sup Ct, N.Y. County, May 5, 2023] [Kelley, J.]; *Checo v Mwando*, 2022 NY Slip Op 31223[U], *4, 2022 NY Misc LEXIS 1865, *5 [Sup Ct, N.Y. County, Apr. 7, 2022] [Kelley, J.]; *Garcia v Solomon*, 2020 NY Misc LEXIS 17635, *2 [Sup Ct, Bronx County, Jun. 19, 2020]; *Charles v Wolfson*, 62 Misc 3d 1224[A], 2019 NY Slip Op 50251[U], *1, 2019 NY Misc LEXIS 866, *3 [Sup Ct, Bronx County, Mar 6, 2019]).

On their prior motion, the plaintiffs did not submit an expert affirmation or affidavit. In connection with the instant motion, however, they have done so, thus rectifying the defect in

**805320/2024 BOUTOV, ALEXANDER A. ET AL vs. HANSON M.D., MATTHEW B. ET AL**      **Page 3 of 11**
**Motion No. 002**

3 of 11

their prior motion.  Specifically, in support of the instant motion, the plaintiffs submitted not only a factual affidavit from the plaintiff Alexander Boutov (the patient), but also sets of medical records generated by several medical providers, and the expert affirmation of board-certified otolaryngologist and neurotologist Benjamin Crane, M.D.

Dr. Crane opined that the defendant otolaryngologists Matthew B. Hanson, M.D., and Billy Yang, M.D., while in the course of their employment for UPB, departed from the applicable standards of care by performing a contraindicated and unnecessary surgical procedure upon the patient at SUNY Downstate Medical Center on November 28, 2023, thus causing the patient to sustain a profound unilateral loss of hearing, debilitating vertigo, loss of balance, and significant pain.

Dr. Crane explained that, on or about May 18, 2023, the patient first presented to Hanson, complaining of a "long history of fluctuating hearing loss in his left ear."  According to Dr. Crane, an audiogram conducted on that date revealed conductive hearing loss in the patient's left ear of approximately 10 decibels (dB), which is a condition that could be caused by earwax buildup, infections, tympanic membrane perforation, or damage to the ossicles.  Dr. Crane asserted that, unlike sensorineural hearing loss, conductive hearing loss does not involve nerve damage.  Upon reviewing the audiogram results, Hanson informed the patient that his symptoms were "similar to the 'loose wire' syndrome seen in patients after stapedectomy," and thereupon expressed a suspicion that the patient suffered from ossicular erosion.  Hanson ordered a computed tomography (CT) scan of the patient's temporal bones, which was to include visualization of the ossicles.  On May 22, 2023, the patient underwent the scan, which, as Dr. Crane interpreted the records, depicted "no discernible temporal bone abnormalities." The patient next saw Hanson on June 15, 2023.  As Dr. Crane framed the issue, despite noting "[t]he CT scan showed normal aerated mastoids with no obvious abnormality" and "the incus lenticular process sees a little offset to the stapes capitulum," Hanson wrote in the patient's chart that the "diagnosis of the problem can really only be mad[e] at surgery."

805320/2024   BOUTOV, ALEXANDER A. ET AL vs. HANSON M.D., MATTHEW B. ET AL          Page 4 of 11
Motion No.  002

4 of 11

According to Dr. Crane, on or about November 28, 2023, Hanson, assisted by Yang, performed a left-sided, middle-ear exploration and stapedectomy upon the patient, a surgical procedure that is performed to improve hearing in individuals with otosclerosis, which he described as a condition where abnormal bone growth prevents the stapes bone in the middle ear from vibrating properly. Dr. Crane asserted that this procedure, which was intended to address the patient's conductive hearing loss, was performed with microscopic dissection. In his operative report, Hanson wrote that he lysed scar tissue in the area of the posterior superior quadrant, and that, after lysing the scar tissue, he cut down the scutum to access the ossicles in the patient's middle ear. As Dr. Crane further described the operative report, after use of the curette and laser lysis, Hanson memorialized the presence of extensive fractures of the stapes, involving the crura and the stapes superstructure, as well as detachment from the footplate, which itself was later noted also to be fractured. Dr. Crane averred that, following that surgery, the patient suffered complete hearing loss, debilitating vertigo, imbalance, and mental anguish resulting from the negligent performance of the surgery. He noted that the patient continued treating with Hanson postoperatively, specifically, until January 25, 2024, at which time Hanson reported that patient was suffering from "profound hearing loss" and "significant vestibular issues related to his surgery."

Dr. Crane expressly opined that Hanson departed from the standard of care in recommending the performance of the November 28, 2023 procedure in the first instance, despite having inadequate findings to warrant surgery. In this respect, he explained that, due to the extreme delicacy of the middle ear's structures and the associated high risk of the procedure, the standard of care dictated that middle-ear surgery should not be performed unless patients are suffering from a significant air-bone gap, which he described as a concept in audiology that is employed to assess the type and severity of hearing loss, and measures, in decibels, the difference between air conduction and bone conduction hearing thresholds. He explained that an air-bone gap is indicative of conductive hearing loss that involves the

805320/2024   BOUTOV, ALEXANDER A. ET AL vs. HANSON M.D., MATTHEW B. ET AL          Page 5 of 11
Motion No.  002

5 of 11

impairment of the sound transmission through the outer or middle ear, and opined that a significant air-bone gap warranting stapes surgery would measure approximately 25 dB or more, thus leading him to the conclusion that an air-bone gap below that threshold does not warrant surgery. Dr. Crane explained that surgery is not warranted in the latter situation due to the extreme risks of performing a middle-ear procedure, including complete hearing loss due to a disruption or impairment of the delicate structures of the middle ear. Dr. Crane asserted that, in addition, the potential benefit of such surgery is less with small air-bone gaps, since the maximum improvement cannot exceed the air-bone gap, and the improvement is often less than that gap. He noted that the patient's preoperative audiology examinations reflected a fluctuating air-bone gap of approximately 10 dB, which he characterized as being far below the threshold for surgery. Dr. Crane concluded that, when that test result is combined with the unremarkable results of the CT scan, the patient should not have undergone a middle-ear surgical procedure, especially a stapedectomy. In this respect, he opined that, despite the frustrating nature of a 10 dB conductive hearing loss, such frustration did not warrant the risks associated with the middle-ear procedure that Hanson and Yang performed on November 28, 2023.

Dr. Crane additionally concluded that Hanson and Yang departed from accepted standards of care in the actual technical performance of the procedure, since the patient's preoperative CT exam depicted no "ossicular abnormalities," that is, no fracture of the ossicles. Inasmuch as the patient's hearing loss was measured preoperatively at only 10dB, and was not "profound," he concluded that the patient's stapes and related structures had not been fractured prior to surgery. Rather, since both Hanson and Yang noted multiple, extensive fractures in their operative report, Dr. Crane opined that "it more likely than not that these were iatrogenic injuries" that Hanson and Yang had caused by virtue of their use of excessive force in lysing the adhesions and taking down the scutum in order to access the middle-ear structures. He characterized such a use of excessive force as a departure from the standard of care, which he explained always requires meticulous and delicate execution of these maneuvers.

[* 6]

Dr. Crane further asserted that the standard of care dictates that if a portion of the footplate should fall into the inner ear during a surgical procedure in the middle ear, the proceduralist is not to penetrate the inner ear to retrieve said debris because the inner ear is so incredibly sensitive that any disruption or agitation within the inner ear unduly increases the risk of total loss of hearing. He asserted that Hanson and Yang, as they reported in their own operative note, breached the inner ear after their use of excessive force resulted in debris falling into the inner ear. Specifically, Dr. Crane averred that, once those physicians fractured the footplate, causing it to breach into the vestibule of the patient's inner ear, they "unnecessarily" attempted to clear out the vestibule, further breaching into the inner ear. Dr. Crane characterized these intraoperative decisions as "blatant" breaches of the standard of care that caused or contributed to the patient's injuries.

The elements of a cause of action to recover for lack of informed consent are

> "(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury"

(*Spano v Bertocci*, 299 AD2d 335, 337-338 [2d Dept 2002]; *see Zapata v Buitriago*, 107 AD3d 977, 979 [2d Dept 2013]). For a statutory claim of lack of informed consent to be actionable, a defendant must have engaged in a "non-emergency treatment, procedure or surgery" or "a diagnostic procedure which involved invasion or disruption of the integrity of the body" (Public Health Law § 2805-d[2]). "'[T]his showing of qualitative insufficiency of the consent [is] required to be supported by expert medical testimony'" (*King v Jordan*, 265 AD2d at 260, quoting *Hylick v Halweil*, 112 AD2d 400, 401 [2d Dept 1985]; *see* CPLR 4401-a; *Gardner v Wider*, 32 AD3d 728, 730 [1st Dept 2006]). Hence, to establish a prima facie entitlement to judgment as a matter of law in connection with such a cause of action, a plaintiff must submit "an expert affirmation stating with certainty that the information defendant[ ] allegedly provided to plaintiff before the

[* 7]

[medical] procedures at issue departed from what a reasonable practitioner would have disclosed" (*Leighton v Lowenberg*, 103 AD3d 530, 530 [1st Dept 2013]). Expert testimony, however, is not necessary with respect to the issue of whether a reasonably prudent person, fully informed, would not have consented to the treatment (*see Gray v Williams*, 108 AD3d 1085, 1086-1087 [4th Dept 2013]; *Hugh v Ofodile*, 87 AD3d 508, 509 [1st Dept 2011]; *Andersen v Delaney*, 269 AD2d 193, 193 [1st Dept 2000]; *Hardt v LaTrenta*, 251 AD2d 174, 174 [1st Dept 1998]; *Osorio v Brauner*, 242 AD2d 511, 511-512 [1st Dept 1997]), although it may be employed to establish that element of a lack of informed consent cause of action.

"'The mere fact that the plaintiff signed a consent form does not establish the defendants' prima facie entitlement to judgment as a matter of law'" (*Huichun Feng v. Accord Physicians*, 194 AD3d 795, 797 [2d Dept 2021], quoting *Schussheim v Barazani*, 136 AD3d 787, 789 [2d Dept 2016]). Where a patient does sign a detailed consent form, there must also evidence that the necessity of the procedure, along with known risks and dangers, were discussed prior to the surgery (*see Bamberg-Taylor v Strauch*, 192 AD3d 401, 401-402 [1st Dept 2021]).

With respect to the lack of informed consent cause of action asserted against UBP, Dr. Crane concluded that neither Hanson nor Yang obtained the patient's fully informed consent to the procedure that they performed. He asserted that, given the high risk associated with a middle-ear surgical procedure such as a stapedectomy, the benefits that the patient would obtain from that procedure were "not outweighed by the negative impact of Mr. Boutov's fluctuating 10 dB hearing loss." As he phrased it, it is "widely recognized that a stapedectomy can be considered successful with a post-operative air-bone gap around 15 dB, and the procedure rarely ever restores perfect hearing following the prosthetic implant." Dr. Crane averred that neither Hanson nor Young ever fully informed the patient of this information, and that, had such a risk-benefit analysis had been explained to him, a reasonable patient under those circumstances would not have undergone the surgical procedure. Dr. Crane further

805320/2024 BOUTOV, ALEXANDER A. ET AL vs. HANSON M.D., MATTHEW B. ET AL Page 8 of 11
Motion No. 002

8 of 11

[* 8]

faulted SUNY Downstate's informed consent form because it recited that the patient was to undergo a "Revision Stapedectomy," when, in fact, the patient actually was undergoing a stapedectomy for the first time. Hence, he concluded that Hanson obtained a written consent for a different procedure than the one that Hanson ultimately performed.

Where a healthcare professional working for a professional corporation, limited liability company, or limited liability partnership renders health care to a patient "within the scope of his or her employment" for that corporation, company, or partnership, that entity may be held vicariously liable for the negligence of that healthcare provider (*Petruzzi v Purow*, 180 AD3d 1083, 1084-1085 [2d Dept 2020]; *Yaniv v Taub*, 256 AD2d 273, 274 [1st Dept 1998]; *Connell v Hayden*, 83 AD2d 30, 46 [2d Dept 1981]; Business Corporation Law § 1505[a][i]; Limited Liability Company Law § 1205[a]; Partnership Law § 121-1500[q] *see also Galpern v De Vos & Co., PLLC,* 10-CV-1952 (CBA) (JMA), 2011 US Dist LEXIS 117095 *39 , 2011 WL 4597491, *13 [ED NY, Sep. 30, 2011] [Limited Liability Company Law is simply a reflection of the common-law rule that a member of a professional limited liability company is liable for those torts of the company in which he or she is a participant]; *see generally Brown-Jodoin v Pirrotti,* 2011 NY Slip Op 34223[U], 2011 NY Misc LEXIS 7307 [Sup Ct, Westchester County Aug. 17, 2011] [denying motion to dismiss in legal malpractice action made by attorney and his professional limited liability partnership]). Inasmuch as UPB is a professional corporation, and there is no dispute that Hanson and Yang were employed by UPB at the time that they performed the subject procedure, UPB may be held vicariously liable for Hanson and Yang's conduct to the extent that they are found to have committed malpractice.

Since the plaintiffs now have established their right to enter a default judgment against UPB on the issue of liability on both their medical malpractice and lack of informed consent causes of action, leave to renew their initial motion must be granted, and, upon renewal, their initial motion for leave to enter such a default judgment against UPB must be granted as well.

Accordingly, it is,

**805320/2024   BOUTOV, ALEXANDER A. ET AL vs. HANSON M.D., MATTHEW B. ET AL**          **Page 9 of 11**
**Motion No.  002**

[* 9]

ORDERED that the plaintiffs' motion for leave to renew their prior motion for leave to enter a default judgment on the issue of liability against the defendant United Physicians of Brooklyn, Inc., is granted, without opposition, and, upon renewal, their motion for leave to enter a default judgment on the issue of liability against the defendant United Physicians of Brooklyn, Inc., is granted; and it is further,

ORDERED that, upon renewal, this court's order dated September 26, 2025 is modified by deleting the words

> "ORDERED that the plaintiffs' motion is denied, without prejudice to renewal upon proper papers, which shall include an expert affirmation or affidavit from an appropriate healthcare professional, who shall render a sufficiently detailed opinion explaining in what manner the defendants Matthew B. Hanson, M.D., and Billy Yang, M.D., committed malpractice that proximately caused the injuries claimed by the plaintiffs here and/or that the consent that those defendants obtained from the Alexander A. Boutov for an invasive procedure was qualitatively insufficient, and that such failure to obtain fully informed consent caused or contributed to the injuries of the plaintiff Alexander A. Boutov";

and substituting therefor the words

> "ORDERED that the plaintiffs' motion is granted, and the plaintiffs may enter a default judgment on the issue of liability against the defendant United Physicians of Brooklyn, Inc.";

and it is further,

ORDERED that the plaintiffs and the defendant United Physicians of Brooklyn, Inc., are directed to proceed to inquest on the issue of the damages to be assessed against the defendant United Physicians of Brooklyn, Inc., which shall be conducted concurrently with the trial of the action against the remaining defendants.

**805320/2024 BOUTOV, ALEXANDER A. ET AL vs. HANSON M.D., MATTHEW B. ET AL** **Page 10 of 11**
**Motion No. 002**

10 of 11

[* 10]

This constitutes the Decision and Order of the court.

| | |
|---|---|
| **3/17/2026** | |
| **DATE** | **JOHN J. KELLEY, J.S.C.** |

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | X | GRANTED | | DENIED | | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

**805320/2024   BOUTOV, ALEXANDER A. ET AL vs. HANSON M.D., MATTHEW B. ET AL**     Page 11 of 11
**Motion No.  002**